531 So.2d 1256 (1988)
Reinaldo AMOROS, Appellant,
v.
STATE of Florida, Appellee.
No. 68840.
Supreme Court of Florida.
September 15, 1988.
Rehearing Denied November 14, 1988.
James Marion Moorman, Public Defender and Douglas S. Connor, Asst. Public Defender, Tenth Judicial Circuit, Bartow, for appellant.
Robert A. Butterworth, Atty. Gen. and Peggy A. Quince, Asst. Atty. Gen., Tampa, for appellee.
PER CURIAM.
Reinaldo Amoros appeals his conviction for first-degree murder and sentence of death. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. This incident of domestic violence arose when Amoros murdered his former girlfriend's current boyfriend. We affirm the conviction but vacate the sentence of death and remand with instructions to the trial court to impose a sentence of life imprisonment without possibility of parole for twenty-five years.
The state's chief witness was the appellant's former girlfriend, Veronica Simmonds. The victim, Omar Rivero, was Simmonds' current boyfriend. The evidence established that on June 1, 1985, the night *1257 before the murder, Amoros had approached Simmonds as she was leaving his parents' home in a new car. After Simmonds refused to answer his questions about who owned the car, Amoros threatened to kill her. The next night, Simmonds went to the police station to report the threat while Rivero remained inside her apartment. As she left, Simmonds padlocked the back door from the outside at Rivero's request. Simmonds went to Amoros' home with a police officer, but Amoros was not there. Upon returning to her own home, she found police investigating the shooting of Rivero.
Two of Simmonds' neighbors testified that at approximately 12:30 a.m. on June 2, just prior to the shooting, a man asked them if a lady and a little girl lived in Simmonds' apartment. Receiving their affirmative answer, the man headed toward the apartment and, about two minutes later, the neighbors heard gunshots which they immediately reported to the police. Later that night, they picked Amoros' picture out of a photopack as the man they had spoken to just prior to the shooting. They also identified Amoros at trial.
An autopsy of the victim revealed three gunshot wounds, two through the right arm and one to the chest, the latter proving fatal. Evidence reflected that the victim had futilely tried to escape through the padlocked back door. On the morning following the shooting, a pistol, which a firearms identification analyst later testified had been used to fire the bullet removed from the victim's chest, was found several miles from the scene.
At trial, the state presented testimony about a prior trial, in which Amoros was acquitted of the murder of one Walter Coney, to show that the pistol which killed Coney was the same weapon used to kill Omar Rivero. Amoros' counsel sought to limit the testimony to show only that the gun had been in Amoros' possession. The state responded that it was necessary to show the bullet which killed Coney had been fired from the gun. Specifically, this testimony revealed that on April 30, 1985, a little more than a month prior to the subject killing, Amoros and a friend went to the home of Paulette Suber, whom Amoros referred to as his wife, to give her some money. After entering the home, Amoros found Paulette in the bedroom with Walter Coney. A fight erupted between Amoros and Coney, during which a shot was fired and Coney was killed. Amoros was seen holding the gun immediately following the shooting. Evidence was presented that Coney started the fight by striking Amoros with a beer can and that Coney had originally pulled the gun. Evidence was also presented that Amoros was acquitted. Before receiving evidence of the Coney incident, the trial judge, at Amoros' request, instructed the jury to consider the testimony and evidence of that incident for the limited purpose of proving identity.[1] Thereafter, a Florida Department of Law Enforcement firearms expert testified that the bullets removed from Coney and Rivero had both been fired from the same gun.
At the instruction conference, the trial judge rejected a requested special instruction on circumstantial evidence. The jury returned a verdict of guilty of first-degree murder.
The state presented no evidence during the penalty phase. Amoros testified in his *1258 own behalf, stating he was a twenty-nine-year-old native of Cuba where he never had any criminal trouble; that he was a college graduate who had been employed in Cuba as a physical education teacher and was a former member of the Cuban national baseball team; that he was the father of two daughters, ages three years and eighteen months, for whom he always provided support; and that he had been a resident of the United States since 1980. The jury recommended Amoros be sentenced to death. At the sentencing before the trial judge, Amoros again testified in his own behalf, and his former girlfriend, Veronica Simmonds, testified that he was the father of her three-year-old daughter, for whom he had always provided financial support and paternal contact.
The trial court imposed the death penalty, finding two aggravating circumstances: (1) the murder was especially heinous, atrocious, and cruel; and (2) the murder was committed in a cold, calculated, and premeditated manner. The court concluded that nonstatutory mitigating factors were established, but determined these mitigating circumstances did not outweigh the aggravating circumstances and imposed a sentence of death.

Guilt Phase
Amoros raises two challenges in the guilt phase of this appeal. First, he argues the trial court improperly admitted similar fact evidence of the shooting of Walter Coney, for which he had been acquitted.
This issue was initiated by the state's filing a notice of intent to rely on other crimes or wrongs or acts, specifically stating its intention to introduce as evidence that "the same firearm was used to kill Walter H. Coney ... and Omar Rivero." At trial, the state announced its intention to call a witness to the Coney shooting who would testify about the events surrounding the incident, including his observation that Amoros was holding the gun immediately following the fatal shot. Amoros' counsel objected to the introduction of any testimony broader than that necessary "to link the gun up with this defendant" and requested the state be limited to asking the witness if he saw Amoros "with the gun in his hand on the day in question." The state responded that it was necessary to demonstrate that Coney was shot and the bullet removed from him in order for the bullet comparison to be effective.[2] The court *1259 granted the defense request for a modified Williams rule instruction to the jury to consider the evidence "for the limited purpose of proving identity on the part of the defendant."
Amoros contends our holdings in State v. Perkins, 349 So.2d 161 (Fla. 1977), and Jackson v. State, 498 So.2d 406 (Fla. 1986), cert. denied, ___ U.S. ___, 107 S.Ct. 3241, 97 L.Ed.2d 746 (1987), mandate a finding of reversible error.
The evidentiary rule governing admissibility of similar fact evidence of another criminal offense was set forth by this Court in Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959), and subsequent cases, and codified into section 90.404(2)(a) of the Florida Evidence Code.[3] The Perkins case concerned a defendant who was being tried for attempted rape of a minor. Testimony established that Perkins had been previously acquitted of the charge of sexually assaulting another minor. We found admission of this similar fact evidence fundamentally unfair. In Jackson, we approved the introduction of evidence showing the defendant had possession of a gun immediately subsequent to the offense for which he was being tried. The evidence revealed that the defendant and the cab driver had struggled for the gun. Evidence that the defendant had picked up the gun and fired it into the back window of the car was deemed inadmissible by the trial judge because it was not necessary to show the defendant's possession of the gun.
In the instant case, the use of the gun in the prior incident was the only evidence the state had to link Amoros to the killing of Rivero. Amoros agrees the evidence of his prior possession of the gun was an essential and relevant part of the state's case. Since the crime laboratory analysis showed the gun fired the bullets that killed Rivero and Coney, and because no other substantial evidence linked Amoros to the gun in the Rivero shooting, this evidence linking him to the gun at an earlier time was clearly relevant. It was essential for the state to demonstrate Amoros' possession of the gun on a prior occasion, but as important was the necessity of showing this gun fired the bullet that killed Walter Coney. Without showing where the bullet in Coney came from, there is no basis to link the gun to the shooting of Rivero. The testing concerning the comparison of the bullets was meaningless without an explanation of where the Coney bullet originated. We reject the assertion that Perkins controls or that Jackson limits admission of the evidence in this instance. Instead, we find that evidence of the possession of the gun and its firing on a prior occasion was clearly admissible to link Amoros to the murder weapon. "In *1260 order for evidence to be relevant, it must have a logical tendency to prove or disprove a fact which is of consequence to the outcome of the action." C. Ehrhardt, Florida Evidence § 401.1 (2d ed. 1984). The facts that Amoros was seen in possession of a gun on a prior occasion and that the bullet fired from that gun on the previous occasion identified it as the same weapon used to kill the victim in the instant offense rendered the evidence relevant whether the circumstances constituted a crime or not. Simply allowing testimony that Amoros had possession of a gun does not serve to identify it as the same murder weapon. The possession of the weapon, the firing of the weapon, the retrieval of the bullet fired from the weapon from Coney's body, and the comparison of the two bullets are all essential factors in linking the murder weapon to Amoros. These factors meet the test of relevancy contained in section 90.401, Florida Statutes (1987).
We recognize relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice. However, almost all evidence to be introduced by the state in a criminal prosecution will be prejudicial to a defendant. Only where the unfair prejudice substantially outweighs the probative value of the evidence should it be excluded. See C. Ehrhardt, Florida Evidence § 403 (2d ed. 1984). The focus in this instance was establishing Amoros' prior possession of the specific weapon which caused Omar Rivero's death. Perkins is clearly distinguishable because in that case the focus was on a similar pattern of criminal conduct rather than the linking of a defendant to a critical piece of evidence. We conclude the evidence was relevant and its prejudice did not substantially outweigh its probative value.
We find appellant's second contention, that the court erroneously denied his request for a jury instruction on circumstantial evidence, is without merit and does not warrant discussion.

Penalty Phase
We will only address appellant's contentions that (1) the trial court erroneously found the aggravating factor of heinous, atrocious, and cruel; (2) the trial court erroneously found the aggravating circumstance of cold, calculated, and premeditated; and (3) the death sentence was not proportionately correct under these facts.
With regard to Amoros' first contention, we agree that the aggravating factor of heinous, atrocious, and cruel was erroneously applied. The record reflects that Amoros did not know the victim and shot him within two minutes after entering the premises for the purpose of confronting and probably shooting his former girlfriend. The medical examiner testified he believed the victim was shot three times at close range, the shots having been fired within a short time of each other. The trial court concluded, in part, that "the victim made a futile attempt to save his life by running to the rear of the apartment, only to find himself trapped at the back door." First-degree murder is a heinous crime; however, this statutory aggravating circumstance requires the incident to be "especially heinous, atrocious, and cruel." See § 921.141(5)(h), Florida Statutes (1987). We are unable to distinguish this case from Lewis v. State, 377 So.2d 640 (Fla. 1979), where the victim was shot in the chest and several more times as he attempted to flee. In finding this aggravating circumstance did not apply in Lewis, we reiterated our explanation of the type of acts that the legislature intended to be covered by this aggravating circumstance:
"What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies  the conscienceless or pitiless crime which is unnecessarily torturous to the victim."
Id. at 646 (quoting State v. Dixon, 283 So.2d 1, 9 (Fla. 1973), cert. denied sub nom. Hunter v. Florida, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974)) (emphasis added). We reject the state's contention that our decision in Phillips v. State, 476 So.2d 194 (Fla. 1985), applies. We note that in Phillips the victim was stalked by the defendant *1261 and the defendant stopped and reloaded his weapon before firing the final shots. In the instant case, the evidence reflects the shots were fired very soon after Amoros discovered the victim. On this record, we find the state has failed to establish beyond a reasonable doubt that this conduct comes within the scope of "especially heinous, atrocious, and cruel." The facts do not set this murder "apart from the norm of capital felonies." See Dixon, 283 So.2d at 9; see also Lloyd v. State, 524 So.2d 396 (Fla. 1988).
We next address the contention that the trial judge erred in finding the aggravating circumstance that this murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. See section 921.141(5)(i), Fla. Stat. (1987). We agree and conclude that, although there was sufficient evidence of premeditation, there was an insufficient showing in this record of the necessary heightened premeditation, calculation, or planning required to establish this aggravating circumstance. See Rogers v. State, 511 So.2d 526 (Fla. 1987), cert. denied, ___ U.S. ___, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988); Combs v. State, 403 So.2d 418 (Fla. 1981), cert. denied, 456 U.S. 984, 102 S.Ct. 2258, 72 L.Ed.2d 862 (1982). In McCray v. State, 416 So.2d 804 (Fla. 1982), we explained that this circumstance applies to those murders which are characterized as executions or contract murders, although that description is not intended to be all inclusive. In Rogers v. State, we found this aggravating circumstance requires a calculation which includes a careful plan or prearranged design and receded from a broader use of the circumstance in Herring v. State, 446 So.2d 1049 (Fla.), cert. denied, 469 U.S. 989, 105 S.Ct. 396, 83 L.Ed.2d 330 (1984), particularly where there was no evidence of any prearrangement. The only evidence of a plan was Amoros' threat to his former girlfriend. However, no evidence was presented to establish that Amoros knew the victim or was aware that the victim was residing with his former girlfriend at the time he entered the apartment. We reject the supposition that Amoros' threat to the girlfriend can be transferred to the victim under these circumstances.
Having found the only two aggravating circumstances utilized to justify the death sentence were erroneously applied, there remains no basis for imposition of the death penalty. We should note that, given the circumstances in this record, the imposition of a life sentence appears to be proportionately correct. See Kampff v. State, 371 So.2d 1007 (Fla. 1979); Irizarry v. State, 496 So.2d 822 (Fla. 1986); Ross v. State, 474 So.2d 1170 (Fla. 1985).
Accordingly, we affirm the conviction, but vacate Amoros' death sentence and reduce his sentence to life imprisonment without eligibility for parole for twenty-five years.
It is so ordered.
EHRLICH, C.J., and OVERTON, McDONALD, SHAW, GRIMES and KOGAN, JJ., concur.
BARKETT, J., concurs in result only.
NOTES
[1] The state and the defense stipulated that the bullet identified as Exhibit 24 was the bullet removed from the body of Walter Coney, and the judge instructed the jury as follows:

THE COURT: Members of the jury, there's a stipulation that the State and the defendant have agreed to, and I'm going to at this time read to you that stipulation. And that means you don't need to hear any further evidence with regard to these matters. But the stipulation is an agreement between the State and defendant that these facts have been established.
And that is, that Dr. Lee Miller, Associate Medical Examiner, during the autopsy of Walter Coney who died on April 30, 1985, removed from the body of Walter Coney State's Exhibit No. 24.
The State and the Defense further stipulate that Detective Harold Winsett of the Hillsborough County Sheriff's Office delivered that exhibit, State's Exhibit No. 24 ... to the Florida Department of Law Enforcement Crime Laboratory on Buffalo Avenue here in Tampa, Florida, and that he delivered that to the crime laboratory on June 10, 1985.
So that evidence is now before you likewise.
[2] The following exchange occurred at trial when Amoros' counsel sought to limit the state's inquiry:

MR. JOHNSON [DEFENSE COUNSEL]: Your Honor, it's my understanding that the sole purpose of this witness .. . [is] to link the gun up with this defendant. And, therefore, it appears that anything broader than that may get to the point where we talk about the violation of the Williams Rule as opposed to comporting with the Williams Rule. I think ... the identity of the weapon 
THE COURT: Identity of the weapon and the identity of the defendant connect him with the weapon. It would go to the identity of the defendant, I think, too.
MR. BENITO [STATE ATTORNEY]: I'm going to get into the fact that happened that day in order to identify the defendant as to when he saw the gun in his hand.
THE COURT: You want to do what, now?
MR. BENITO: The Court recalls his testimony from the first trial. I mean, he went over there 
THE COURT: It's been a while, but  They were in a bar, I think, and then they went over to the house. And there was a little boy, I think, in the living room watching television. And he went looking for his common law wife; she was in the bedroom. He knocked on the door, and she came out. There was a man in there with her. There was an argument, pushing and shoving and whatever. There was a shot fired, and he was seen with a gun in his hand.
MR. BENITO: By this witness, after the shot was fired. The witness was holding Paulette Suber, and the shot was fired, and he turned around.
THE COURT: Do we need to get into the fact they were in a bar and came over there?
MR. BENITO: I'm just going to ask him, "Did you go to Paulette Suber's house with the defendant?" And he's going to say, "Yeah." And I'm going to say, "What happened when you got there?" And he says, "There was a fight, and I turned around, and the guy had the gun in his hand."
THE COURT: All right.
MR. JOHNSON: Your Honor, obviously my position would be that, of course, if he asks him if he saw the man with the gun in his hand on the day in question, I think that's all that is necessary. I think the State is trying to tie it 
MR. BENITO: I have to put the bullet in Mr. Coney. So I have to show that he was shot, and he pulled the bullet out of Mr. Coney.
THE COURT: Let me ask a question. The instruction reads that, "The evidence you are about to receive concerning the evidence of other crimes allegedly committed by the defendant," all right? That's what it says.
MR. BENITO: Uh-huh.
THE COURT: All right. He has been tried and acquitted for this activity.
MR. BENITO: There's no problem with that. The fact that he's been acquitted, there's no bearing with the case law. He can be found not guilty, and you can use this instruction. I'm sure Mr. Johnson is going to bring out on cross-examination of Mr. Page when he testifies, that the man, in fact, was found not guilty. And I don't think I'll be able to object to that.
THE COURT: Let me finish reading it, though. It says, "Other crimes alleging"  "will be considered by you for the limited purpose of proving identity on the part of the defendant. You shall consider it only as it relates to that issue. However, the defendant is not on trial for a crime which is not included in the indictment."
Is that what you want me to give?
MR. JOHNSON: Yes, Your Honor.
THE COURT: As I just read it?
MR. JOHNSON: That's fine.
THE COURT: You want me to give it at this time?
MR. JOHNSON: Yes, sir.
[3] The pertinent portion of section 90.404(2)(a) reads:

Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.