681 So.2d 688 (1996)
Dana WILLIAMSON, Appellant,
v.
STATE of Florida, Appellee.
No. 84198.
Supreme Court of Florida.
September 19, 1996.
*689 Scott A. Mager, Robert E. Hodapp and Carl Schoeppl of Mager & Associates, P.A., Fort Lauderdale, for Appellant.
Robert A. Butterworth, Attorney General and Celia A. Terenzio, Assistant Attorney General, West Palm Beach, for Appellee.
*690 PER CURIAM.
Dana Williamson appeals his convictions for first-degree murder, armed burglary, extortion, three counts of attempted murder, five counts of armed kidnapping, and four counts of armed robbery, and his respective sentences including his sentence of death. We have jurisdiction pursuant to article V, § 3(b)(1) of the Florida Constitution, and we affirm both the convictions and sentences.
On Friday, November 4, 1988, police responded to a 911 call made by Donna Decker from her home in Davie, Florida. During the call, Donna said that she had been stabbed, gave her address and referred to her husband and child. When the police arrived at the Decker house, they found Robert Decker, Donna's husband; Carl Decker, the Deckers' two-year-old son; and Clyde Decker, Robert's father, in the master bedroom. The two Decker men and the child had been shot in the head with a .22-caliber gun. Robert was shot twice in the back of the head, Clyde in the cheek, and Carl behind his ear. Despite their injuries, all three remained alive. Police found Donna Decker's body next to a telephone receiver in a closet the Deckers used as an office. She had been stabbed to death. Various items had been taken from the Decker residence.
On August 13, 1992, Dana Williamson and Charles Panoyan were indicted by a grand jury in Broward County for acts arising out of the criminal episode that occurred at the Decker residence on the evening of November 4, 1988. The charges against Panoyan were eventually dismissed, and he was released. At Williamson's trial, Robert Decker, Clyde Decker,[1] and Charles Panoyan gave testimony about the events surrounding the criminal episode. To effectively consider the issues presented by appellant in this case, we find it is necessary to recount in considerable detail the content of that testimony.[2]

Testimony of Robert Decker
Robert and Donna Decker married in 1972 and lived in the home in which the criminal episode occurred for approximately two years prior to November 4, 1988. Clyde Decker moved in with Robert and Donna in October 1988, shortly after Clyde's wife died. Clyde then began assisting Robert in his construction business.
Panoyan also worked for Robert in 1988. Robert and Panoyan met each other in the early 1970s and had grown to know each other well. Panoyan had helped Robert extensively in the construction of Robert's home.
On November 4, 1988, Panoyan was working on a construction site with Robert and Clyde. It was payday, and Robert had given Panoyan $500 in cash. Later that evening Robert, Clyde, and Carl, the Decker's two-year-old son, went to a restaurant for dinner. Donna did not accompany them because she worked that evening. The Decker men and Carl arrived home from dinner at approximately 8:50 p.m. and found Panoyan waiting in his truck in the driveway. Robert estimated the time of arrival based upon the fact that he had arrived home in time to watch the television program "Dallas," which began at 9 p.m.
Robert asked Panoyan why he was there and then proceeded into the house. Panoyan and the Decker men sat down in front of the television. Robert, who was aware of Panoyan's tendency to talk, told Panoyan he would have to be quiet during "Dallas" or leave. Before the show began, Panoyan stood up from his chair and said something to Clyde which Robert could not hear. Clyde testified that Panoyan said he was going to his truck to get some venison. According to Clyde, Panoyan had indicated earlier in the day that he intended to deliver some venison to the Decker residence that evening.
Robert saw Panoyan bring a package of venison into the house. As soon as Panoyan returned to his chair in front of the television, *691 another man entered the house and placed a gun to Clyde's head. Robert described the man as white and within two inches of five feet, ten inches tall. He said the gunman was wearing new work boots, blue-jean pants, a blue-jean jacket, a yellow plaid shirt, brown work gloves, a stocking mask on his face, and a yellowish-white, straw cowboy hat.
The gunman said, "You all go over there, and I will put handcuffs on you. Lay on the floor in the living room." Robert asked Panoyan if he knew the gunman, but Panoyan was silent. Robert said he could tell by the look on Panoyan's face that Panoyan knew the gunman.
Panoyan, Clyde, and Robert followed the gunman's instructions. The gunman handcuffed all three men and had Robert show him the location of a floor safe in a walk-in closet in the master bedroom. After determining the safe might be hooked up to a burglar alarm, the gunman ordered Robert and Carl, who had followed his father into the bedroom, to lie on the floor. The gunman thereafter retrieved Clyde from the living room and pushed him onto the bed in the master bedroom. The gunman tied Robert's feet before returning to the living room.
Robert managed to loosen the rope around his feet and move to the bedroom doorway. From this position, he could see the gunman talking to Panoyan in the living room. Panoyan was seated in a reclining chair. While the gunman and Panoyan were whispering to each other, the gunman noticed Robert standing at the bedroom door. The gunman stormed back into the bedroom and tied up Robert again.
After retying Robert, the gunman began rummaging through drawers and cupboards in various parts of the house. While the gunman was going through the house, Robert managed to get loose again. The gunman, upon discovering that Robert had again freed himself, hog-tied Robert. After securing Robert, the gunman asked him where he kept his money and drugs. Although there was $2,000 in cash in the house which Clyde had brought with him when he moved in, Robert responded he had none. The cash, along with a number of other items, was missing after the episode.
The gunman continued to rummage through the house. While he was in the master bedroom, Donna arrived home. Robert estimated that the time was approximately 9:15 p.m. Donna asked Panoyan what he was doing at the house and then went to the master bedroom. The gunman grabbed her, tied her hands, and dragged her into the hallway. Donna lost a shoe and cried during the struggle.
Robert could hear the gunman and Donna talking in another room. A short time later, Donna came back into the master bedroom and asked if the gunman was gone. The gunman suddenly appeared and pulled Donna from the bedroom. Robert did not see his wife alive again.
Robert continued to hear the gunman rummaging through the house. Robert surmised he was going through the kitchen or the office at this time. At approximately 9:50 p.m., the gunman returned to the bedroom with a legal-sized sheet of white paper, which had four straight lines drawn on it. Donna's signature was on one of these lines. The gunman asked Robert to sign the paper, but he did not like Robert's signature as compared to his driver's license signature and ordered him to sign a second time. At approximately 10 p.m., the gunman shot Robert, Clyde, and Carl.

Testimony of Charles Panoyan
Panoyan later identified the gunman as appellant, Dana Williamson. During his testimony, Panoyan indicated that Rodney Williamson, appellant's brother, also was present at the Decker house on the night of the murder. Panoyan explained that he knew the Williamson brothers because he was good friends with and often visited their father, Charlie Williamson. He had met Charlie Williamson at approximately the same time he met Robert Decker. Panoyan and Charlie Williamson were neighbors for a period of time and often returned favors for one another. Charlie Williamson also asked his son, the appellant, to help Panoyan on several occasions. On one such occasion, which occurred during the time Panoyan was helping *692 Robert Decker build his house, Charlie Williamson asked appellant to give Panoyan a ride to the Decker house.
When Charlie Williamson suffered a stroke in 1987, Panoyan visited him on a regular basis. At that time, Rodney Williamson, appellant, and appellant's wife and two children lived with Charlie Williamson. On one of Panoyan's visits to the Williamson house, which occurred approximately one to two weeks before the murder, appellant asked Panoyan whether he knew anything about Robert Decker's involvement with drugs. Panoyan answered that Robert Decker did not deal in drugs. While Panoyan was visiting Charlie Williamson the night before the murder, however, appellant continued to insist that he knew Robert Decker was dealing in drugs. Panoyan again told appellant that Robert did not. Panoyan and appellant went fishing together later that evening.
In his testimony recounting the events of November 4, 1988, Panoyan maintained he had no responsibility for the crimes that occurred at the Decker house. He testified that as he walked outside the house to retrieve the venison from his truck, the Williamson brothers approached him. The two brothers told him they were going to rob Robert Decker. When Panoyan protested, both of the brothers pointed guns at him. Appellant told Panoyan that if Panoyan said anything or failed to follow his instructions, he would signal the man in the bushes and somebody would go to his house to kill his family. Panoyan then reentered the house and appellant followed a few minutes later. Panoyan recognized as his own the gun appellant carried into the house and testified that appellant must have taken it from the glove compartment of his truck.
Panoyan testified, consistent with Robert Decker, that when appellant entered the house, he wore a nylon stocking mask, a cowboy hat, and gloves. He further testified, consistent with Robert Decker, that appellant ordered the three men to lie down on the floor so he could handcuff them. According to Panoyan, appellant then took Clyde Decker's wallet and asked Robert Decker for his wallet. Robert Decker told appellant his wallet was in the safe, and appellant asked where the safe was located. Robert Decker told appellant the safe was in the bedroom, and the gunman moved everyone there. Robert Decker was placed on the bed, and Clyde Decker, Carl Decker, and Panoyan were placed on the floor. The appellant tied Clyde and Robert Decker's feet and then took Panoyan back into the living room.
At this time, appellant asked Panoyan where Robert Decker put the drugs and money. When Panoyan insisted that he did not know anything about drugs or money, appellant began to hit and kick him. Appellant again asked Panoyan where the drugs and money were hidden. While Panoyan was responding to appellant's question, he and appellant noticed Robert Decker watching them. After returning Robert to the bedroom, appellant continued without success to question Panoyan about the location of any drugs or money.
Appellant bound Panoyan in a chair and began walking around the house. A short time thereafter, Donna Decker arrived home. She said hello to Panoyan and asked where Robert Decker was located. The appellant grabbed Donna, and Panoyan put his head down. When he raised his head a few moments later, Panoyan saw the lights go on in the office. After about three or four minutes, the appellant exited the office and returned to the living room.
Appellant then hog-tied Panoyan and put him on the living room floor. While Panoyan was tied up, appellant took Panoyan's wallet. As appellant looked through the wallet, he told Panoyan, "[Y]ou know who I am and you know what I am capable of doing.... You know my reputation." Panoyan had in his wallet a list of names, addresses, and telephone numbers of coworkers, friends, and family members. Appellant told Panoyan that he would torture and kill members of his family to get to Panoyan. Panoyan asked if appellant intended to kill him, but appellant replied that he just wanted to get Panoyan's attention. Appellant then described in graphic detail how he would torture and kill Panoyan's wife, daughter, and son if Panoyan said anything about what occurred at the Decker house.
*693 Appellant thereafter untied Panoyan and sent him outside with Rodney Williamson. Rodney Williamson held Panoyan at gunpoint and made him drive a short distance in his own truck. After ordering Panoyan to pull over, Rodney Williamson told Panoyan that if it were his decision, he would have killed Panoyan. Rodney Williamson also repeated the threats made by appellant against Panoyan's family.
While Rodney Williamson and Panoyan were talking, appellant ran up to the truck without wearing the hat or mask he had previously worn. He had three guns in his possession. The appellant told Rodney that something had gone wrong and ordered Panoyan to go home without contacting the police. Appellant reminded Panoyan that harm would come to his family if he said anything about this incident.
Panoyan did not proceed directly home; he stopped at a shopping center and approached a security guard. He remembered asking the guard for a quarter to call his wife but did not recall any other details of their conversation. As a result of that conversation, however, the security guard summoned a police officer. The police officer detained Panoyan and escorted him to the Decker house. By the time Panoyan and the police officer arrived back at the house, other officers had responded to Donna's 911 call. The officers had already discovered that Donna Decker had been stabbed to death and that Robert, Clyde, and Carl Decker had been shot.
Panoyan was taken to the police station and questioned about the murder. He told investigators what occurred in the Decker house, but he did not indicate that he knew the identity of the assailant. He testified at trial that he did not reveal appellant's identity at that time because he had seen what had happened at the house and knew what appellant could do to his family. When questioned about his knowledge of appellant's reputation, Panoyan indicated he knew that appellant had previously killed a baby.
In May 1990, both Panoyan and the appellant were arrested and charged with murder. Panoyan had been a suspect for some time prior to his arrest. Appellant was arrested as a result of an anonymous tip to police. The two men were detained in the same jail facility. Panoyan testified that while in jail, appellant exploited his fear of appellant in order to maintain complete control over him.
Panoyan was released on his own recognizance after being incarcerated for eighteen months. Several months after his release, he told police that appellant was responsible for the crimes committed at the Decker residence. He explained at trial that he finally came forward with this information after approximately three years because he discovered that Rodney and appellant were the only two persons involved in the crime. Appellant had told Panoyan that there were a number of other men involved in the crime and that those unidentified men would help to carry out his threats. Shortly before his release, however, Panoyan discovered through a conversation with appellant that the claims regarding the involvement of other men were false. After Panoyan testified before the grand jury, all charges against him were dropped.

Inmate Testimony
The State presented testimony from three inmates who were incarcerated with appellant. These inmates testified regarding various inculpatory statements appellant made to them. Specifically, the inmates provided testimony about their conversations with appellant in which he recounted the details of the crimes committed at the Decker house. One inmate, Patrick O'Brien, also testified regarding appellant's killing of a four-year-old child. Because O'Brien's testimony is pertinent to an issue raised by appellant, we recount its content here.
O'Brien stated in his testimony that he shared a cell with appellant for approximately eight days and that during that time, the two men discussed the crimes with which appellant was charged. Appellant initially told O'Brien that the victims had been shot and stabbed and that there was little evidence against him. Several times during their discussions, appellant implicated his brother Rodney Williamson in the crime, but eventually he admitted being the gunman *694 and stabbing Donna Decker himself. He also told O'Brien that with Rodney's help he was still hunting the Deckers in order to prevent them from testifying.
With respect to what caused Rodney and appellant to commit this crime, appellant told O'Brien that he knew Robert Decker was a contractor and that Robert had a large sum of cash because he had recently received the first payment to build several new houses. Appellant explained to O'Brien that Panoyan was unaware of his plan to rob Robert Decker but that he did not think Panoyan would turn him in because Panoyan feared him. That fear, appellant told O'Brien, was the result of appellant's threats and Panoyan's knowledge that appellant had previously killed a four-year-old child with a baseball bat.

Other Evidence
The State presented circumstantial evidence linking appellant to the crime. The State also presented evidence demonstrating that appellant owned a hat similar to the hat found following the murder at the Decker residence and evidence linking appellant and his brother to the utility belt found in the back of Panoyan's truck. The utility belt had on it the keys to the handcuffs that were used to bind Robert and Carl Decker.

The Trial Court's Judgment
Appellant was found guilty of all charges. The jury recommended death by a vote of eleven to one. The trial court followed the recommendation. The judge found three aggravating circumstances: (1) Williamson was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person;[3] (2) the capital felony was committed while Williamson was engaged or was an accomplice in the commission of or an attempt to commit burglary, robbery, and kidnapping;[4] and (3) the capital felony was especially heinous, atrocious, or cruel.[5] The trial judge rejected the aggravating circumstance that the murder was committed in a cold, calculated, and premeditated manner,[6] as well as two statutory mental mitigating circumstances.[7] He found evidence supporting a number of nonstatutory mitigating factors[8] and gave each factor some or little weight.

The Appeal
On appeal, appellant raises six issues: (1) evidence about the crime for which appellant was convicted of manslaughter in 1975 was erroneously admitted during the guilt phase; (2) the extortion count should have been severed from the trial; (3) the trial court erroneously admitted irrelevant evidence consisting of divorce papers and a quitclaim deed executed by appellant; (4) the jury's verdict is not supported by competent, substantial evidence; (5) the mitigating circumstances mandate that appellant's death sentence be vacated; and (6) section 921.141 is unconstitutional.[9]
As his first issue, appellant argues that evidence about a prior crime he committed *695 was erroneously admitted during the guilt phase of his trial.[10] Specifically, he alleges that statements made by O'Brien and Panoyan that appellant had previously killed a child were introduced solely to demonstrate bad character and propensity for violent behavior in violation of the Williams[11] rule as codified by section 90.404(2)(a), Florida Statutes (1993). O'Brien's testimony was introduced first. During direct examination, O'Brien testified as to statements appellant made to him while they were cellmates. The following excerpt contains the specific statement appellant challenges:
Q. What did Dana [Williamson] say about Panoyan's state of mind?
A. It was very easy. The dude was toldfigured he would never testify against him. Kind of stupid.
Q. Did he tell you why he wouldn't testify against him? Did he tell you what he had said to Panoyan?
A. I put the gun to his head and told him to keep your mouth shut or I'll make your family suffer.
Q. Did he say anything else about the reasons why Panoyan was in fear of him?
A. Well, Mr. Panoyan knew about his past. He knew that Williamson had killed before and he would have no problem killing again. He killed a four year old kid with a baseball bat.
At the point in the trial when this testimony was introduced, it was clear that Panoyan's credibility was a material issue on which the State's case depended. Panoyan was the State's key witness. Defense counsel, through his opening statement and cross-examination of the State's witnesses, had emphasized that Robert Decker saw Panoyan whispering to the gunman during the criminal episode; that Panoyan was the only person at the Decker house to be released unharmed; that police had considered Panoyan to be a suspect from the time of the criminal episode; and that Panoyan did not identify appellant as the assailant until three years after the criminal episode. Evidence that was relevant to Panoyan's credibility could therefore be admitted.
The State argued that the portion of O'Brien's testimony indicating Panoyan was aware of the prior crime was relevant to the issue of Panoyan's credibility because it explained why Panoyan had concealed appellant's identity for approximately three years. According to this testimony, Panoyan feared appellant, and that fear was due in part to Panoyan's knowledge that appellant had previously killed a baby. In ruling that the testimony was admissible, the trial court correctly observed that section 90.404(2)(a), Florida Statutes, was not applicable to its introduction. See Bryan v. State, 533 So.2d 744 (Fla.1988), cert. denied, 490 U.S. 1028, 109 S.Ct. 1765, 104 L.Ed.2d 200 (1989). This evidence was not offered for the purpose of proving that because appellant committed a prior crime similar in nature to the instant crime he committed the instant crime. Rather, O'Brien's testimony was offered to recount an admission by appellant in which appellant explained why he believed Panoyan would not identify him as the assailant in this case. We agree with the trial judge that this testimony was relevant to the issue of Panoyan's credibility.
Moreover, we find that section 90.404(2)(a) does not bar O'Brien's testimony because his testimony was relevant to an issue other than bad character or propensity. The decision in Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959), supports our conclusion. In Williams we stated that "evidence of any facts relevant to a material fact in issue except where the sole relevancy is character or propensity of the accused is admissible unless precluded by some specific exception or rule of exclusion." Id. at 663 (emphasis added).
Likewise, the testimony elicited during Panoyan's direct examination which alluded to the prior crime was relevant to the issue of Panoyan's credibility. After Panoyan testified that his fear that appellant would carry *696 out his threats kept him from identifying appellant, the following exchange occurred:
Q. When you're on the floor in that house and Dana [Williamson] talked to you about his reputation, what went through your mind?
A. I was going to get killed.
Q. What exactly did he say to you about his reputation?
. . . .
A. He said, you know who I am and you know my reputation. You know what I'm capable of doing.
. . . .
Q. What did you know [h]is reputation to be?
A. He is a person who killed a baby. Stomped it to death and beat this other one so bad that it was brain dead.
In addition to explaining why appellant did not identify appellant for three years, this testimony provided the jury with the full context of the criminal episode. Cf. Griffin v. State, 639 So.2d 966, 968 (Fla.1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1317, 131 L.Ed.2d 198 (1995); Griner v. State, 662 So.2d 758, 759 (Fla. 4th DCA 1995). The testimony explains why Panoyan believed at the time of the crime that appellant was capable of carrying out his threats and, consequently, why he cooperated with appellant during the criminal episode. The admission of this testimony thus did not violate the rule set forth in Williams.
Appellant further asserts that even if the testimony about the prior crime was relevant, it was so inflammatory that its probative value was outweighed by its prejudicial effect in violation of section 90.403, Florida Statutes (1993). Appellant argues that the probative value of the testimony of both O'Brien and Panoyan was minimal because the violent nature of the crimes committed at the Decker home sufficiently demonstrated that he was capable of carrying out the threats Panoyan testified appellant made. Additionally, appellant claims the testimony was highly prejudicial because it established the graphic nature of the prior crime. He claims that O'Brien's testimony was especially prejudicial because it erroneously led the jury to believe that he used a baseball bat to beat the four-year-old victim. The trial judge overruled appellant's section 90.403 objections to this testimony. We conclude that the trial judge acted within his discretion in overruling the objections.
Almost all evidence introduced during a criminal prosecution is prejudicial to a defendant. Amoros v. State, 531 So.2d 1256, 1258 (Fla.1988). In reviewing testimony about a collateral crime that is admitted over an objection based upon section 90.403, a trial judge must balance the import of the evidence with respect to the case of the party offering it against the danger of unfair prejudice. Only when the unfair prejudice substantially outweighs the probative value of the evidence should it be excluded. Id. Based upon our review of the record, we conclude that the trial judge did not abuse his discretion in performing the necessary weighing process and admitting the testimony regarding appellant's prior crime. See, e.g., Jackson v. State, 522 So.2d 802, 806 (Fla.), cert. denied, 488 U.S. 871, 109 S.Ct. 183, 102 L.Ed.2d 153 (1988); Washington v. State, 432 So.2d 44, 47 (Fla.1983). The testimony from O'Brien and Panoyan was integral to the State's theory of why its key witness acted as he did both during and after the criminal episode. Had the trial judge precluded either witness's testimony, the jury would have been left with a materially incomplete account of the criminal episode. Thus, we conclude that the trial judge did not err in admitting this testimony.
Appellant next argues that the trial court admitted the testimony about appellant's prior conviction because it was relevant to the extortion count and, consequently, the court should have severed the extortion count from the trial. Extortion was properly charged on these facts, the jury found the appellant guilty of extortion, and appellant does not challenge that conviction. Consequently, there was no reason to sever the extortion count at this stage in the proceedings.
Moreover, as explained in detail above, the court's decision to admit the testimony was not made solely on the basis of *697 the extortion count. The record shows that the trial judge also admitted the inmate's testimony because it went to the issue of Panoyan's credibility. Accordingly, even if the extortion count had been severed, the testimony from Panoyan and O'Brien would still have been admissible in the murder trial because it was relevant to Panoyan's credibility. See Fotopoulos v. State, 608 So.2d 784, 790 (Fla.1992), cert. denied, 508 U.S. 924, 113 S.Ct. 2377, 124 L.Ed.2d 282 (1993); Bundy v. State, 455 So.2d 330, 345 (Fla. 1984), cert. denied, 476 U.S. 1109, 106 S.Ct. 1958, 90 L.Ed.2d 366 (1986). Any error in not severing the extortion count was therefore harmless.[12]
In his third claim, appellant alleges that the court erroneously admitted as evidence a quitclaim deed and divorce papers that he previously executed. Evidence was introduced during trial which demonstrated that the gunman in this case, for an unexplained reason, asked the Deckers to sign their names to a legal-sized piece of paper. The State argued, as part of its identification theory, that this evidence demonstrated the gunman had knowledge of legal forms. As proof that appellant, like the gunman, had knowledge of legal forms, the State sought to introduce several legal documents appellant previously had executed. The court found the documents were relevant to show that appellant shared common characteristics with the gunman and admitted them. Appellant argues that because the papers signed by the Deckers were not recovered, the documents admitted were irrelevant. Further, he argues that even if relevant, the documents served only to confuse and mislead the jury because they implied that he took advantage of his wife and father.[13]
We agree with the trial judge that the documents were relevant to the issue of identity. Moreover, we agree that their introduction did not violate section 90.403. Even if we accepted that the documents were of limited probative value, we do not comprehend how their introduction unfairly prejudiced appellant. Regardless, any error in admitting the documents was harmless. State v. DiGuilio, 491 So.2d 1129 (Fla.1986).
Appellant's claim that the jury's verdict was not supported by competent, substantial evidence is likewise without merit. The testimony recounted in this opinion in conjunction with the circumstantial evidence presented at trial provides competent, substantial evidence of appellant's guilt. We therefore affirm appellant's convictions.
With regard to the penalty phase, appellant contends that the trial court improperly rejected the statutory mental mitigators and failed to give sufficient weight to several nonstatutory mitigators. He also claims that the trial court improperly found the heinous, atrocious, or cruel aggravator. We reject each of these claims.
First, we find that the trial court used the appropriate standard to assess the statutory mental mitigators that: (1) the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance; and (2) his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. Appellant alleges that the judge required him to prove these mitigators beyond a reasonable doubt rather than by a preponderance of the evidence by repeatedly questioning the experts about whether a nexus existed between appellant's alleged brain dysfunction and his behavior on the night of the crime. The record does not support appellant's contention that the trial court required him to meet this heightened standard. The trial judge's questions evinced a recognition that a person may suffer a brain dysfunction without experiencing any of the behavioral effects commonly associated with these mitigators. The trial judge thus acted within his discretion *698 when he asked the experts their views as to the effects of appellant's alleged brain dysfunction. See Roberts v. State, 510 So.2d 885, 895 (Fla.1987) (approving the trial court's rejection of the statutory mental mitigators despite some evidence of brain damage where the experts' testimony did not indicate that defendant exhibited at the time of the murder any behavior indicative of these mitigators), cert. denied, 485 U.S. 943, 108 S.Ct. 1123, 99 L.Ed.2d 284 (1988).
We have examined the record, and we do not conclude that the trial judge abused his discretion by finding there was insufficient evidence to support the two statutory mental mitigating circumstances. Nor did the trial judge abuse his discretion in rejecting a nonstatutory mental mitigator based upon the appellant's contended brain dysfunction. There was conflicting evidence in the record with regard to appellant's alleged brain dysfunction, and the trial judge could have properly concluded that these mitigators were not proven. See Sireci v. State, 587 So.2d 450, 453-54 (Fla.1991), cert. denied, 503 U.S. 946, 112 S.Ct. 1500, 117 L.Ed.2d 639 (1992); Roberts, 510 So.2d at 894.
Similarly, we reject appellant's contention that the trial judge failed to give sufficient weight to appellant's dysfunctional upbringing. The record reflects that there was conflicting evidence for the court to consider with regard to these mitigators including evidence that appellant's siblings became productive members of society despite a similar upbringing. See Jones v. State, 648 So.2d 669, 680 (Fla.1994), cert. denied, ___ U.S. ___, 115 S.Ct. 2588, 132 L.Ed.2d 836 (1995). Consequently, we find that the trial judge acted within his discretion when he gave only some weight to the mitigating circumstances related to appellant's childhood.
Next, we reject appellant's claim that the trial court improperly found the heinous, atrocious, or cruel aggravator. We have consistently upheld this aggravator in cases where the victim is repeatedly stabbed. See, e.g., Finney v. State, 660 So.2d 674, 685 (Fla.1995), cert. denied, ___ U.S. ___, 116 S.Ct. 823, 133 L.Ed.2d 766 (1996); Pittman v. State, 646 So.2d 167, 173 (Fla.1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1982, 131 L.Ed.2d 870 (1995); Hardwick v. State, 521 So.2d 1071, 1076 (Fla.), cert. denied, 488 U.S. 871, 109 S.Ct. 185, 102 L.Ed.2d 154 (1988); Johnston v. State, 497 So.2d 863, 871 (Fla. 1986). Accordingly, we find that the trial court appropriately found and evaluated the mitigating and aggravating circumstances and that the death sentence is proportionate in this case.
Finally, appellant challenges the constitutionality of section 921.141, Florida Statutes. We find this claim to be without merit as the constitutionality of this statute has been continuously upheld. See Gamble v. State, 659 So.2d 242, 246 (Fla.1995), cert. denied, ___ U.S. ___, 116 S.Ct. 933, 133 L.Ed.2d 860 (1996); Thompson v. State, 619 So.2d 261, 267 (Fla.), cert. denied, 510 U.S. 966, 114 S.Ct. 445, 126 L.Ed.2d 378 (1993).
Based on the foregoing, we affirm appellant's convictions and his sentence of death.
It is so ordered.
KOGAN, C.J., and OVERTON, SHAW, GRIMES, HARDING, WELLS and ANSTEAD, JJ., concur.
NOTES
[1] A videotape of Clyde Decker's deposition to perpetuate testimony was presented to the jury because Clyde was unavailable to testify at trial.
[2] Clyde Decker's account of the events was generally consistent with that of Robert Decker, so we do not recount the details of his testimony here.
[3] § 921.141(5)(b), Fla. Stat. (1993).
[4] § 921.141(5)(d), Fla. Stat. (1993).
[5] § 921.141(5)(h), Fla. Stat. (1993).
[6] § 921.141(5)(i), Fla. Stat. (1993).
[7] See § 921.141(6)(b), (f), Fla. Stat. (1993).
[8] The judge found the following mitigators: (1) the defendant had an exceptionally unhappy and unstable childhood; (2) the defendant was deprived of parental love; (3) the defendant's life and psychological makeup was one of emotional instability; (4) the defendant was born as a product of an accident; (5) the defendant was aware of the physical, emotional, and sexual abuse suffered by his mother; (6) the defendant was incarcerated in prison at an early age; (7) the defendant was beaten as a child; (8) the defendant spent many years in prison; (9) the defendant has little education; (10) the defendant had a deprived childhood; (11) the defendant's appearance and demeanor at trial was calm and under control.
[9] Williamson raises two additional issues in his brief and relies on the arguments made at trial with respect to those issues: (1) the trial court should have granted Williamson's motion to suppress his statement to police; and (2) the trial court should have granted Williamson's motion for mistrial based on prosecutorial misconduct. Based on the record, we conclude the trial court properly dispensed with each of the motions and find further discussion of these issues unnecessary.
[10] Appellant committed this crime in 1975 and was subsequently convicted of manslaughter. The jury was not told about the conviction.
[11] Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959).
[12] The State contends that appellant did not file a motion to sever the extortion charge, and thus the issue was not preserved. We find it unnecessary to address this claim in light of our conclusion on this issue.
[13] The deed introduced at trial concerned the property of appellant's father. Appellant feared its admission could lead the jury to believe he swindled his father. Appellant was also concerned that the divorce papers admitted would portray him as underhanded because his wife was unaware of the divorce proceedings.