753 So.2d 29 (2000)
Manuel Antonio RODRIGUEZ, Appellant,
v.
STATE of Florida, Appellee.
No. SC90153.
Supreme Court of Florida.
February 3, 2000.
Rehearing Denied March 23, 2000.
*33 Scott W. Sakin, Special Assistant Public Defender, Miami, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Randall Sutton, Assistant Attorney General, Miami, Florida, for Appellee.
PER CURIAM.
Manuel Antonio Rodriguez appeals his convictions and sentences for armed burglary and three counts of first-degree murder, including the sentences of death for each first-degree murder conviction. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons expressed, we affirm the convictions and sentences.

FACTS
Manuel and Luis Rodriguez were both charged with armed burglary and three counts of first-degree murder. In exchange for his testimony at Manuel's trial, Luis was allowed to plead guilty to second-degree murder, for which he received a life sentence. Although they both have the same last name, Manuel and Luis are not related by blood. At the time of the crimes, Manuel lived with Luis's sister, Maria Malakoff, who was also known as "Cookie."
Manuel Rodriguez was convicted based on the following facts presented at trial. In December 1984, Bea Joseph, Sam Joseph, and Genevieve Abraham were found murdered in a Miami apartment building. The Josephs lived in the apartment in which they were found, and Sam Joseph was the apartment complex landlord. Abraham was visiting the Josephs at the time of the crimes. When Abraham was found, her wedding band, diamond watch, and diamond earrings were missing. There was no sign of forced entry into the apartment, but the apartment was in disarray. Apparently, each victim died quickly *34 from gunshot wounds to the head, which were inflicted from shots fired at close range.
Law enforcement officers were unable to obtain enough evidence to solve these crimes until 1993. However, Manuel Rodriguez was suspected of involvement in the crimes soon after they occurred because of several calls he made to the police. In July 1985, police were contacted by a "tipster," who identified himself as Antonio Chait. The informant told them that on the night of the murders, he was living in the apartment complex where the murders occurred and he saw two males, one of whom he knew, running from the area near the Josephs' apartment. The tip was found to be without merit, and police determined that the informant was actually Rodriguez. Again, in November 1985, Rodriguez contacted police, identifying himself as Antonio Traves. He told police that on the night of the murders, he saw a man named Geraldo leaving the Josephs' apartment. That story could not be confirmed. Police were suspicious of Rodriguez but received no further leads until 1992.
In 1992, Rafael Lopez, Luis Rodriguez's brother-in-law, contacted police, hoping to get the reward that had been posted for information about the murders. Lopez told police that Luis had confided to him that Luis and Manuel Rodriguez committed the murders. He stated that Luis told him that he and Manuel went to the Josephs' apartment to rob them and that they killed two old ladies and an old man. Thereafter, police contacted Luis, who eventually gave a formal confession, in which he implicated both himself and Manuel. The next day Manuel was questioned and arrested. Manuel gave numerous conflicting accounts of his activities at the time of the murders. In all but his final statement to police, he denied any involvement in the murders. Finally, he admitted involvement but contended that the robbery and murders were committed by Luis and Luis's brother Isidoro, and that he had simply acted as a lookout.
Luis Rodriguez testified against Manuel Rodriguez at trial. His trial testimony was somewhat different from his original confession.[1] At trial, Luis testified that in 1984 he was living in Orlando. He stated that Manuel called him and asked if he was interested in making money by assisting Manuel in committing a robbery. Manuel told Luis that Luis would be the lookout and that Manuel would do all of the work. Luis flew to Miami and met Manuel. They went to the Josephs' apartment; Manuel knocked on the door and told Sam Joseph that Malakoff and the children were being held hostage and that they would be released only if the Josephs gave him money. Manuel then forced himself into the apartment. Luis followed and shut the door.
Once inside the apartment, Manuel, who had brought two pairs of rubber gloves with him, put on one pair and told Luis to wear the other pair and not to touch anything in the apartment without the gloves. Sam Joseph offered to get money from the bedroom, but Manuel instructed Luis to look there instead. Luis found a gun in the Josephs' bedroom, and Manuel became angry with Sam Joseph because he thought the offer to get money from the bedroom was actually a ruse to get the gun. Eventually, during the course of the crime, Manuel shot both Sam and Bea Joseph with a gun he had brought with him and then he ordered Luis to shoot Abraham with the gun Luis had found in the Josephs' bedroom. Because Luis was scared, he did as he was told and then he fled. He stated that he did not receive any of the proceeds from the crime and flew back to Orlando the next day.
Luis's brother, Isidoro, also testified at trial. He provided documentation that he was working in another city at the time of *35 the crimes. He also stated that, soon after the murders, his mother contacted him to tell him that she had found coins and jewelry in a bag under her trailer and that Manuel and Malakoff had shown up looking for it. Isidoro stated that he was aware of the murders in the building and that he took the bag back to Orlando, where he threw it into a field. Isidoro's mother also testified and confirmed Isidoro's story.
Malakoff testified that she and Manuel had two children, one of whom died in 1984. She stated that members of her family did not like her or Manuel. She also said that Manuel was not angry with Sam Joseph at the time of the murders and that she did not believe that Manuel was involved in the murders. The State impeached her testimony through her sworn statement to the police in 1993, in which she said that Manuel had been angry with Sam Joseph and on the day of the murders had called him a son-of-a-bitch. Additionally, in her pretrial statement, she said that Manuel told her he killed Sam Joseph when Joseph reached for a gun; that he had made sure that Luis killed Abraham; and that Manuel made sure they were all dead.
Manuel Rodriguez was convicted as charged. The following evidence was presented during the penalty phase.
The State presented evidence that Manuel Rodriguez had seventy-one prior violent felony convictions (the contemporaneous murders in this case, twenty-three convictions of armed robbery, seventeen for armed kidnaping, eight for aggravated assault with a firearm, and numerous convictions for carrying a concealed weapon and possession of a firearm by a convicted felon) and that he was on probation and parole at the time of the murders.
Both the State and Manuel Rodriguez presented the testimony of numerous psychologists and psychiatrists who had evaluated Rodriguez over the preceding twenty years. Apparently, whenever Rodriguez was charged with a crime, a question of competency was raised and he was evaluated. Most of those who examined him agreed that he suffered from some sort of mental illness, but the testimony varied greatly in that some had previously found him to be incompetent and in need of hospitalization; others had found him to be malingering. None could testify to his state of mind at the time of the murders. The testimony did establish that Rodriguez had a long history of drug abuse. Several of his family members testified regarding his childhood and his mother's mental problems.
The jury unanimously recommended death for each of the murders. The judge sentenced Rodriguez to death for each murder, finding six aggravating circumstances: the murder was committed while Rodriguez was under a sentence of imprisonment, he had previously been convicted of violent felonies, the murder was committed during the felony of armed burglary, the murder was committed to avoid arrest, the murder was committed for pecuniary gain, and the murder was cold, calculated and premeditated (CCP). The trial judge found no statutory mitigation, but found some nonstatutory mitigation: Rodriguez was and is mentally ill, he has a history of drug abuse and drug psychosis, and he is a good brother, loving father, and caring son. The judge rejected Rodriguez's mother's mental illness and the fact that Luis Rodriguez received life[2] as mitigating circumstances.

GUILT PHASE ISSUES
In this appeal, Rodriguez raises a total *36 of nine claims.[3] The first four pertain to guilt phase issues. First, he claims that a state witness was improperly allowed to comment on Rodriguez's right to remain silent and that the prosecutor improperly commented on Rodriguez's right not to testify at trial.
As to the witness's comment, the record reflects the following pertinent facts. Detective William Venturi testified regarding the meetings between Manuel Rodriguez and police in 1985 when Rodriguez contacted the police to tell them he had information regarding the murders. As noted previously, Rodriguez contacted the police on two separate occasions, once in July of 1985 and once in November of 1985, claiming he had information regarding the murders. In July, he contacted the police, identified himself as Antonio Chait, and told the police he had seen two males running from the area near the Josephs' apartment. The tip was found to be without merit and the police determined that the informant was actually Manuel Rodriguez.
In November 1985, Manuel Rodriguez again contacted the police, identifying himself as Antonio Traves. Venturi testified that when Rodriguez contacted the police the second time, he recognized Rodriguez as the same person who had contacted the police earlier. He further testified that Rodriguez admitted he had lied to the police when he contacted them in July; that he then told them that he had seen a man named Geraldo leaving the apartment at the time the murders were committed; and that the police spent several days investigating this information.
Venturi further stated that the police met with Manuel Rodriguez again at police headquarters several days later in 1985 and Venturi told Rodriguez that the information he had provided was not worthy of investigation. Venturi testified that he told Rodriguez he thought Rodriguez was involved in the crime; read him his Miranda[4] rights; and, when he asked Rodriguez to tell him what really happened, Rodriguez "bowed his head down and he just began to cry. There was some silence there and again I just felt that at this point I had to continue with my interrogation, but he refused to answer [any] more of my questions." Venturi also noted that the interview then ended because Rodriguez was getting sick.
When Rodriguez objected to these comments, the trial court stated as follows: "It is close enough that it could appear [to be] a comment on his right to remain silent. I don't think it was absolutely a comment on his right to remain silent. But the way it was phrased, it certainly is open to speculation. Do you want a curative instruction?" Rodriguez rejected the trial court's offer of a curative instruction, asserting that it would only magnify the situation. The court then stated: "For the record I believe that although it was clearly improper comment by the officer, that it doesn't rise to a level of comment on the defendant rights [sic] to remain silent, since it was followed up by comment by [the] detective that the interview was terminated because the defendant said he was not well. I believe the detective himself cured any taint or reference to the defendant's right to remain silent."
*37 We agree with the trial court that Venturi's explanation that this interview in 1985 was terminated because Rodriguez had become sick minimized any taint caused by the comment that Rodriguez refused to answer any more questions. Moreover, even were we to find this brief comment to be an impermissible comment on the defendant's right to remain silent, given Manuel Rodriguez's subsequent admission after his arrest seven years later in 1992 that he was present at the time of the crimes, that he helped Luis Rodriguez gain entrance to the Josephs' apartment, and that he acted as a lookout, the trial court did not abuse its discretion in refusing to grant a mistrial. See Cole v. State, 701 So.2d 845, 853 (Fla.1997), cert. denied, 523 U.S. 1051, 118 S.Ct. 1370, 140 L.Ed.2d 519 (1998); Power v. State, 605 So.2d 856, 861 (Fla.1992).
Manuel Rodriguez also asserts that the prosecutor made improper comments during closing argument concerning Rodriguez exercising his right to remain silent. During closing arguments, the prosecutor remarked that "somebody obviously was in that apartment with Luis Rodriguez. And we still haven't heard in any of the arguments, in any of the discussions, what the theory is of who that second person could have been." The court sustained Rodriguez's objection to this comment but did not grant his motion for mistrial.
Shortly thereafter in his argument the prosecutor argued that:
Counsel asked you during voir dire by that I mean the jury questioning portioncounsel asked you, "Would you be willing to listen to two sides, to both sides of the story?" Those were the questions you were asked.
This is not a story. This is real life. This is not a fictional tale. And there was nothing in the direct or cross examination of any witness who testified that pointed to any other person being involved other than Luis Rodriguez and this defendant. There were no two sides.

The trial court overruled Rodriguez's objection to these statements. According to Rodriguez, these latter comments were also improper comments on his constitutional right to remain silent. We agree.
A defendant has the constitutional right to decline to testify against himself in a criminal proceeding. See U.S. Const. amend. V; art. I, § 9, Fla. Const. Therefore, "any comment on, or which is fairly susceptible of being interpreted as referring to, a defendant's failure to testify is error and is strongly discouraged." State v. Marshall, 476 So.2d 150, 153 (Fla.1985); see also, e.g., Heath v. State, 648 So.2d 660, 663 (Fla.1994); State v. DiGuilio, 491 So.2d 1129, 1131 (Fla.1986). The "fairly susceptible" test is a "very liberal rule." DiGuilio, 491 So.2d at 1135. This constitutional principle is also incorporated in Florida Rule of Criminal Procedure 3.250, which prohibits a prosecuting attorney from commenting on the defendant's failure to testify on his or her behalf.
Comments on a defendant's failure to testify can be of an "almost unlimited variety" and any remark which is "fairly susceptible" of being interpreted as a comment on silence creates a "high risk" of error. DiGuilio, 491 So.2d at 1135-36. However, despite our repeated admonitions to avoid any comment that is "fairly susceptible" to interpretation as a comment on silence, this Court has attempted to draw a distinction between impermissible comments on silence and permissible comments on the evidence in the case.
For example, in Marshall, we concluded that the prosecutor erred by stating in closing that "the only person you heard from in this courtroom with regard to the events on November 9, 1981, was [the one witness to the crime]." 476 So.2d at 151 (emphasis supplied). In Marshall, the State argued that the prosecutor's remarks constituted a comment on the evidence before the jury. As explained by the Fourth District's opinion, "[s]ince only two people witnessed the events in question, *38 and one of those chose not to testify, we cannot accept the state's argument that the prosecutor's remarks amounted to nothing more than a comment on `the evidence as it existed before the jury.'" Marshall v. State, 473 So.2d 688, 689 (Fla. 4th DCA 1984). "`A constitutional violation occurs ... if either the defendant alone has the information to contradict the government evidence referred to or the jury `naturally and necessarily' would interpret the summation as a comment on the failure to testify.'" Id. at 689 (quoting United States v. Bubar, 567 F.2d 192, 199 (2d Cir.1977)). In Marshall, we agreed with the Fourth District that "the prosecutor's comments impermissibly highlighted the defendant's decision not to testify." 476 So.2d at 153 (quoting Marshall, 473 So.2d at 689).
Similarly, in Heath, where the only witnesses to the decedent's murder were the decedent, the defendant, and the defendant's brother, we concluded that it was improper for the prosecutor to state in the opening statement that the defendant's brother would be the only one to testify as to what occurred. 648 So.2d at 663. As in Marshall, we found these comments were "fairly susceptible of being interpreted by the jury as a comment on the defendant's failure to testify." Id.; see also Dailey v. State, 594 So.2d 254, 257-58 (Fla.1991) (prosecutorial comments "virtually indistinguishable" from the comments in Marshall were error); State v. Kinchen, 490 So.2d 21, 22 (Fla.1985) (prosecutor's comment that the defendant's out-of-court statements were "unrefuted" was fairly susceptible to being considered a comment on the defendant's failure to testify).
At least two appellate opinions have observed a tension between our decision in Marshall and our earlier decision in White v. State, 377 So.2d 1149 (Fla.1979). See Dean v. State, 690 So.2d 720, 724 n. 1 (Fla. 4th DCA 1997); Crawford v. State, 473 So.2d 700, 702 (Fla. 4th DCA 1985) (Glickstein, J., specially concurring), quashed, 491 So.2d 1142 (Fla.1986). In White, referring to the testimony of the eyewitness in closing argument, the prosecutor said, "You haven't heard one word of testimony to contradict what she has said, other than the lawyer's argument." 377 So.2d at 1150 (emphasis supplied). Relying on cases that held that a prosecutor may comment on the uncontradicted or uncontroverted nature of the evidence, the Court upheld the conviction without mentioning whether the only person who could have contradicted the eyewitness was the defendant. See id.
The problem with this analysis is that where the evidence is uncontradicted on a point that only the defendant can contradict, a comment on the failure to contradict the evidence becomes an impermissible comment on the failure of the defendant to testify. Notably, White was decided before Marshall and DiGuilio and our adoption of a harmless error analysis in those cases. We thus clarify that to the extent there is any tension between the approved-of remarks in White and the disapproved-of remarks in Marshall, we hold that the reasoning of Justice McDonald in Marshall should be followed.
We also caution that our attempted distinction in State v. Sheperd, 479 So.2d 106, 107 (Fla.1985), between a comment concerning the defense generally as opposed to the defendant individually must likewise be narrowly interpreted, and should not be read as authorizing a comment on the defendant's failure to testify. Subsequent to our decision in Sheperd, we explained in Jackson v. State, 575 So.2d 181, 188 (Fla.1991), that the State may not comment on a defendant's failure to mount a defense because doing so could lead the jury to erroneously conclude that the defendant has the burden of doing so. See also Hayes v. State, 660 So.2d 257, 265 (Fla.1995). There is a "narrow exception" to this rule, applicable where the defendant has asserted a defense of alibi, self-defense, or defense of others, relying on facts that could be elicited only from a witness who is not equally available to the *39 State. Jackson, 575 So.2d at 188. Unless the circumstances fall within this "narrow exception," these matters are not the subject of fair comment, and any comment "fairly susceptible" to being construed as a comment on the failure to mount a defense is impermissible.
We also distinguish a category of cases that involve "invited response," while cautioning that this exception should also be narrowly interpreted. For example, in Dufour v. State, 495 So.2d 154, 160 (Fla. 1986), the prosecutor's statement to the jury that "[y]ou haven't ... heard any evidence that [the defendant] had any legal papers in the cell with him" was a proper rebuttal to the defense attorney's statement in closing that an adverse witness could have had access to and based his testimony on the defendant's "legal papers."
Likewise, in Barwick v. State, 660 So.2d 685, 694 (Fla.1995), we held that in the context presented, the prosecutor's statement, "what fact, what testimony, what anything have you heard as a result of him going down to that police station would create a reasonable doubt in your mind," was not a comment on the defendant's failure to testify, but a direction for the jury to consider the evidence presented. In that case defense counsel had suggested that an impropriety had taken place when Barwick had made his taped confession, and the State's argument was made to counter the defense's argument on that subject.
In this case, the prosecutor's statements, "we still haven't heard in any of the arguments, in any of the discussions, what the theory is of who that second person could have been," and "there was nothing in the direct or cross examination of any witness who testified that pointed to any other person being involved other than [one witness and the defendant] ... [t]here were no two sides," neither fell within the narrow exception of Jackson nor were invited responses as found in Dufour and Barwick. Defense counsel's questioning in voir dire about listening to two sides of the story did not invite the State's response within the meaning of our prior cases. Like the comments we found impermissible in Marshall, we find these remarks to be susceptible to interpretation as comments on the defendant's failure to testify and also to impermissibly suggest a burden on Manuel Rodriguez to prove his innocence.
However, it is well settled that such erroneous comments do not require an automatic reversal. See DiGuilio, 491 So.2d at 1137; Marshall, 476 So.2d at 153. In this case, we find that the trial court did not abuse its discretion in denying the motion for mistrial as to the first comment. See Cole, 701 So.2d at 853; Power, 605 So.2d at 860. Similarly, we find that the second comment, the objection to which the trial court overruled, was harmless beyond a reasonable doubt. See DiGuilio, 491 So.2d at 1137. The evidence presented to the jury in this case included Manuel Rodriguez's admission that he was present in the apartment, as well as other numerous inculpatory remarks. Nonetheless, we strongly caution prosecutors against making comments that may be interpreted as comments on the defendant's failure to testify or that impermissibly suggest a burden on the defendant to prove his or her innocence.
In his second claim, Rodriguez asserts that the trial court erroneously refused one of his peremptory challenges. During jury selection, Rodriguez tried to exercise a peremptory challenge against a venireperson. The State objected, noting that the venireperson was Hispanic. Rodriguez justified the challenge by stating that the venireperson had been charged and arrested for carrying a concealed firearm and that the charges were eventually dropped. Rodriguez sought to challenge the venireperson, stating that he feared the venireperson would feel a debt of gratitude to the State. The trial court determined that the explanation was racially *40 motivated and pretextual because other venirepersons on the panel who had prior arrests and were similarly situated were not challenged. According to Rodriguez, there is no basis in the record to support the trial court's conclusions, especially given that one of the other similarly situated venirepersons was also Hispanic.
Under Melbourne v. State, 679 So.2d 759 (Fla.1996), the following procedure must be followed for challenging peremptory strikes: (1) the objecting party must make a timely objection, must show that the venireperson is a member of a distinct racial group, and must request that the court ask the striking party the reasons for the strike; (2) if step (1) is met, the court must ask the proponent of the strike to explain the reason for the strike; (3) if the reason given is facially race-neutral and the court believes that given all the circumstances surrounding the strike, the explanation is not a pretext, the strike will be sustained. In step (3), the court's focus is on the genuineness and not the reasonableness of the explanation. Further, the relevant circumstances that the court is to consider in determining whether the explanation is pretextual include such factors as the racial makeup of the venire; prior strikes exercised against the same racial group; a strike based on a reason equally applicable to an unchallenged venireperson; or singling out the venireperson for special treatment. Id. at 764 n. 8. On appeal, peremptory challenges are presumed to be exercised in a nondiscriminatory manner, but the trial court's decision, which turns primarily on an assessment of credibility, will be affirmed on appeal unless clearly erroneous. Id. at 764.
The record reflects that just before the peremptory challenge at issue, Manuel Rodriguez sought to peremptorily challenge a thirty-six-year-old Latin male. The court allowed the strike based on Rodriguez's explanation that the prospective venireperson had indicated that the justice system is unjust. Two venirepersons later, Rodriguez sought to strike the venireperson at issue, a thirty-six-year-old Latin male, based on the following: a prior arrest for which he went through some sort of program, which purportedly indebted him to the State; his purported low intelligence and youth; and because "[j]ust looking at the composition of the jury as I understand it trying to see who's who I don't feel comfortable with him." The court found that these reasons appeared to be both racially motivated and pretextual because other venirepersons, whom Rodriguez had accepted, also had been accused of crimes. The court additionally noted that no questions had been asked of the venireperson regarding any special feelings the venireperson had toward the State and that he did not appear to he "slow." On this record, we cannot say that the trial court's ruling was clearly erroneous. This is especially true given that we cannot determine the absence of pretext where the similarly situated venireperson used by Rodriguez to support his argument was never identified as Hispanic.[5]Cf. Davis v. State, 691 So.2d 1180 (Fla. 3d DCA 1997) (failure to identify race of venireperson makes it impossible for appellate court to review question of pretext).
In his third claim, Manuel Rodriguez raises another issue regarding a peremptory challenge, asserting that the trial court erroneously allowed a peremptory challenge to be exercised by the State. *41 During jury selection, the State sought to challenge a venireperson for cause based on the State's perception that the venireperson could not return a guilty verdict if the verdict was based on the testimony of a codefendant. Rodriguez objected to the challenge, noting that nothing in the venireperson's answers indicated that she could not return a guilty verdict based on a codefendant's testimony. The venireperson was recalled, and, after further questioning, the court denied the challenge for cause. The State then peremptorily challenged the venireperson. Rodriguez objected based on the fact that the venireperson was an African-American female. The State justified the challenge by explaining that the venireperson did not seem to understand the questions asked. Rodriguez disagreed, stating that the venireperson had merely answered the questions in a quiet voice. The court allowed the challenge, finding that the venireperson seemed to have difficulty understanding the questions asked of her and in being understood by the court. The court noted:
I had difficulty understanding what she was saying to begin with. I do note most of the questions asked of her, she was asked so little by either side, they were all basically leading type questions that allowed her to answer yes or no or rather simply. It did seem when I questioned her that she was not following my questions or understanding them fully. I was speaking slowly and very directly to her. I am going to find at this time it is not only race neutral but does not appear to be in any way pretextual.
As stated above, the trial court's decision on a peremptory challenge turns primarily on an assessment of credibility and will be affirmed on appeal unless it is clearly erroneous. Melbourne, 679 So.2d at 764. We cannot, on a cold record, second-guess whether the venireperson was difficult to understand or followed and understood the court's questions. This is exactly the type of credibility assessment that must be made by the trial court and, on this record, we cannot say that the trial court's decision was clearly erroneous. Accordingly, we deny this claim.
Next, Rodriguez argues that the trial court erroneously allowed the State to present evidence regarding other crimes committed by him. According to Manuel Rodriguez, Luis Rodriguez improperly testified that he had seen Manuel engage in two acts of violence and that Manuel had blackmailed Malakoff for money; Detective Venturi improperly made reference to the fact that Manuel had a police "ID number"; and Detective Crawford erroneously stated that Manuel had used ten false names, when in fact he had used only two.
As to Luis Rodriguez's testimony, the record reflects the following. During Manuel Rodriguez's cross-examination of Luis, Manuel explored Luis's possible bias against Manuel, and his motive to testify falsely, by asking Luis if he disliked Manuel. Luis stated that he did not like Manuel because of the way Manuel had treated Luis's sister and niece. Based on this questioning, the State asserted that Manuel had opened the door to further questioning of Luis regarding his reasons for disliking Manuel.
The trial court allowed the State to proffer the testimony it intended to elicit from Luis. In the proffer, Luis referred to Manuel's numerous criminal activities. The court found much of the proffered testimony to be inadmissible, especially as to his incarcerations and details of prior criminal convictions. However, the court found that Luis could properly testify that he had seen Manuel engage in two acts of random violence and that Manuel had blackmailed Malakoff. Manuel conceded that he had opened the door to this testimony, but he argued that the prejudicial nature of this testimony far outweighed its probative value.
Manuel now asserts on appeal that he never asked Luis "why" he disliked Manuel; he simply asked him "if' he disliked him, and Luis volunteered why he disliked *42 him. Manuel asserts that, because Luis's answer was complete, Manuel never opened the door to Luis's further testimony. Manuel further asserts that Luis's testimony was irrelevant because it did not show his dislike for Manuel; rather, it showed that he feared Manuel, which he contends had nothing to do with Manuel's guilt. Because Manuel conceded below that he opened to the door to the introduction of this testimony, this argument is not preserved for appeal.
Moreover, even if we found this argument to be properly raised, we would not find that the trial court abused its discretion in allowing the limited testimony into evidence while at the same time excluding most of the proffered testimony. Manuel was attempting to discredit Luis as a biased witness; thus, the State was properly allowed to cross-examine him on a limited basis regarding his reasons for his dislike or fear of Manuel. The trial court carefully considered and limited the testimony that was admitted. However, we caution trial courts to exercise extreme caution in admitting evidence of prior collateral crimes, even when faced with an argument by the State that the door has been opened. The issue is not always whether the door has been opened, but rather how wide it has been opened.
As an evidentiary principle, the concept of "opening the door" allows the admission of otherwise inadmissible testimony to "qualify, explain, or limit" testimony or evidence previously admitted. Tompkins v. State, 502 So.2d 415, 419 (Fla. 1986); see Huff v. State, 495 So.2d 145, 150 (Fla.1986). The concept of "opening the door" is "based on considerations of fairness and the truth-seeking function of a trial." Bozeman v. State, 698 So.2d 629, 631 (Fla. 4th DCA 1997). "For example, in McCrae v. State, 395 So.2d 1145, 1151 (Fla.1980), defense counsel through his questions on direct examination `tactfully attempted to mislead the jury into believing that [the defendant's] prior felony was inconsequential.'" Bozeman, 698 So.2d at 631 (quoting McCrae, 395 So.2d at 1151). In McCrae, this Court held that to negate the misleading impression given by defense counsel's question, the prosecutor was entitled to elicit the nature of the prior felony conviction on cross-examination. 395 So.2d at 1152. The Court held that the defendant's
line of questioning could have deluded the jury into equating appellant's conviction of assault with intent to commit murder with his previous misdemeanors. Consequently, the state was entitled to interrogate [the defendant] regarding the nature of his prior felony in order to negate the delusive innuendoes of his counsel.
Id.
In this case, Manuel Rodriguez attempted to establish that Luis Rodriguez disliked him in order to show Luis's bias against him. Thus, it was appropriate for the trial court to consider whether to admit evidence that would explain the basis for Luis's dislike of Manuel. Accordingly, the only issue before this Court is whether the probative value of this testimony outweighed its prejudicial impact.
A trial judge is afforded significant discretion in determining whether the prejudicial nature of evidence outweighs any relevance the evidence may have at trial. See, e.g., Williamson v. State, 681 So.2d 688, 696 (Fla.1996), cert. denied, 520 U.S. 1200, 117 S.Ct. 1561, 137 L.Ed.2d 708 (1997). As we stated in Williamson:
Almost all evidence introduced during a criminal prosecution is prejudicial to a defendant. Amoros v. State, 531 So.2d 1256, 1258 (Fla.1988). In reviewing testimony about a collateral crime that is admitted over an objection based upon section 90.403, [Florida Statutes (1999),] a trial judge must balance the import of the evidence with respect to the case of the party offering it against the danger of unfair prejudice. Only when the unfair prejudice substantially outweighs *43 the probative value of the evidence should it be excluded.... The testimony [at issue] was integral to the State's theory of why its key witness acted as he did both during and after the criminal episode. Had the trial judge precluded [this] testimony, the jury would have been left with a materially incomplete account of the criminal episode. Thus, we conclude that the trial judge did not err in admitting this testimony.
Williamson, 681 So.2d at 696 (citations omitted). In this case, the State's theory was that Manuel Rodriguez was the instigator of the crimes and that Luis Rodriguez shot Abraham because he feared Manuel. In admitting this testimony, the trial court significantly limited what Luis could say before the jury, eliminating much of what was said in the proffer based on the fact that the testimony would be unduly prejudicial to Manuel. We conclude that, under these circumstances, the trial court reached a proper balance in excluding a significant amount of prejudicial evidence but in allowing the evidence that would show why Luis disliked Manuel and why he feared him.
We do find that the testimony of the detectives was erroneously admitted. However, we find that the admission of this testimony was harmless error. The reference to the police "ID number" and alias testimony consisted of but one comment each in the course of lengthy witness presentations. Moreover, the trial court provided Manuel Rodriguez with the opportunity to correct the incorrect alias testimony, but he declined that option.
Although this issue was not raised by Rodriguez, we have independently reviewed the evidence in this case, see Jennings v. State, 718 So.2d 144, 154 (Fla. 1998), cert. denied, ___ U.S.___, 119 S.Ct. 2407, 144 L.Ed.2d 805 (1999), and we conclude that the evidence is sufficient to support the murder convictions.

PENALTY PHASE ISSUES
In his fifth claim, Rodriguez asserts that the State was improperly permitted to allow Detective Crawford to testify to the hearsay statements made to him by an inmate named Alejandro Lago, who had previously shared a cell with Manuel Rodriguez. Specifically, Crawford testified to double hearsay: Lago told him that Manuel Rodriguez had said that he (Rodriguez) was not crazy; Rodriguez just used his pills to get high; and Rodriguez knew that he had to act insane or the police would connect him to other crimes. We agree that the admission of this testimony was erroneous.
We start with the uncontroverted proposition that the Sixth Amendment right of confrontation applies to all three phases of the capital trial. See Donaldson v. State, 722 So.2d 177, 186 (Fla. 1998) (quoting Engle v. State, 438 So.2d 803, 813-14 (Fla.1983)). As we stated in Engle::
The requirements of due process of law apply to all three phases of a capital case in the trial court: 1) The trial in which the guilt or innocence of the defendant is determined; 2) the penalty phase before the jury; and 3) the final sentencing process by the judge. Although defendant has no substantive right to a particular sentence within the range authorized by statute, sentencing is a critical stage of the criminal proceeding.
The sixth amendment right of an accused to confront the witnesses against him is a fundamental right which is made obligatory on the states by the due process of law clause of the fourteenth amendment to the United States Constitution. The primary interest secured by, and the major reason underlying the confrontation clause, is the right of cross-examination. This right of confrontation protected by cross-examination *44 is a right that has been applied to the sentencing process.
438 So.2d at 813-14 (citations omitted).
On the other hand, the statute regulating the admission of evidence during the penalty phase provides that:
Any such evidence which the court deems to have probative value may be received, regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the Constitution of the State of Florida.
§ 921.141(1), Fla. Stat. (1997) (emphasis supplied). Under section 921.141, the linchpin of admissibility is whether the defendant has a "fair opportunity to rebut any hearsay statements." The Court has consistently found that the defendant had no opportunity to rebut the out-of-court statements of codefendants who were not available to testify. See Donaldson, 722 So.2d at 186; Walton v. State, 481 So.2d 1197, 1200 (Fla.1985); Gardner v. State, 480 So.2d 91, 94 (Fla.1985); Engle, 438 So.2d at 813-14. Thus, the admission of these hearsay statements of co-defendants in the penalty phase violated the Confrontation Clause. See Donaldson, 722 So.2d at 186; Gardner, 480 So.2d at 94; Engle, 438 So.2d at 813-14.
We do not agree that the fact that Manuel Rodriguez had deposed Lago prior to trial and knew Lago had a lengthy criminal record constituted a "fair opportunity to rebut" the hearsay statements and impeach Crawford's testimony. In this case, the State did not call Lago to testify as to the statements that Rodriguez allegedly made to him, even though Lago was available to testify. If the State had called Lago to testify as to Rodriguez's statements, Rodriguez would have had an opportunity to cross-examine Lago.[6]
Allowing the testimony of a jailhouse informant to be heard through the testimony of another witness not only deprived Rodriguez of the opportunity to cross-examine Lago, but also improperly bolstered Lago's statement by having a potentially more credible police officer repeat the statements of a potentially less credible jailhouse informant. This is because "when a police officer, who is generally regarded by the jury as disinterested and objective and therefore highly credible, is the corroborating witness, the danger of improperly influencing the jury becomes particularly grave." Rodriguez v. State, 609 So.2d 493, 500 (Fla.1992) (quoting Carroll v. State, 497 So.2d 253, 256-57 (Fla. 3d DCA 1985)).
We distinguish this case from those cases in which the police officer gave hearsay testimony concerning a defendant's prior violent felonies. See Hudson v. State, 708 So.2d 256, 261 (Fla.1998); Clark v. State, 613 So.2d 412, 415 (Fla. 1992); Waterhouse v. State, 596 So.2d 1008, 1016 (Fla.1992). Details of prior felony convictions involving the use or threat of violence to the victim are admissible in the penalty phase of a capital trial, provided the defendant has a fair opportunity to rebut any hearsay testimony. See Rhodes v. State, 547 So.2d 1201, 1204 (Fla.1989); Tompkins v. State, 502 So.2d 415, 419 (Fla. 1986).
In the case of prior violent felony convictions, because those details are admissible, it is generally beneficial to the defendant for the jury to hear about those details from a neutral law enforcement official rather than from prior witnesses or victims. In fact, we have cautioned the State to ensure that the evidence of prior crimes does not become a feature of the penalty phase proceedings. See Finney v. State, *45 660 So.2d 674, 683-84 (Fla.1995); see also Duncan v. State, 619 So.2d 279, 282 (Fla.1993)(stating that details of prior felony convictions should not be made a feature of the penalty phase proceedings); Stano v. State, 473 So.2d 1282, 1289 (Fla. 1985) (same). Nonetheless, in many cases, any error in admitting the hearsay testimony has been considered harmless because the certified copy of the conviction itself conclusively establishes the aggravator. See, e.g., Hudson, 708 So.2d at 261; Tompkins, 502 So.2d at 420.
In addition, the defendant's interest in cross-examining the witness is less compelling where the testimony concerns a prior felony conviction. The defendant previously had the opportunity to cross-examine fact witnesses during the trial for the prior felony. The transcripts of the prior trial are also available to rebut the hearsay testimony describing the prior conviction. This is analogous to cases allowing a penalty phase witness to summarize prior testimony because the defendant had the opportunity to cross-examine the declarant during the original proceeding. See Knight v. State, 721 So.2d 287, 293 (Fla. 1998); see also Lawrence v. State, 691 So.2d 1068, 1073 (Fla.1997).
In Spencer v. State, 645 So.2d 377, 383 (Fla.1994), relying on Waterhouse and Clark, we found no error in the trial court's allowing a police officer to testify concerning prior threats made by the defendant to a witness. Although we have not previously required a showing of necessity as a threshold requirement for the admission of penalty phase hearsay admitted under section 921.141(1), we note that in Spencer, the witness was deceased, thereby giving rise to a good-faith reason for not calling the witness. We also found the testimony to be harmless. See id. To the extent that Spencer relied on cases involving an officer testifying to the defendant's prior felonies, we clarify that the mere fact that a defendant has an opportunity to cross-examine the witness who is testifying to the hearsay does not alone constitute a fair opportunity to rebut the hearsay statement.
We reaffirm our precedent allowing a neutral witness to give hearsay testimony as to the details of a prior violent felony because it tends to minimize the focus on the prior crime. However, we caution both the State and trial courts against expanding the exception to allow witnesses to become the conduit for hearsay statements made by other witnesses who the State chooses not to call, even though available to testify. In this case, however, we determine that the admission of the testimony was harmless beyond a reasonable doubt given the number of strong aggravators in this case and the conflicting testimony as to Manuel Rodriguez's mental health, including some testimony that he was a malingerer.
In his sixth claim, Manuel Rodriguez asserts that the trial court improperly limited his introduction of evidence in mitigation. Specifically, he contends that the trial court improperly prohibited Dr. Rosalind Pass from testifying as to Manuel's ability to tell right from wrong in 1977 on the ground that Pass's conclusion that Rodriguez was insane in 1977 was not relevant because Rodriguez had not raised insanity as a defense. Rodriguez asserts that this testimony should have been admitted in the penalty phase proceeding because a defendant is entitled to introduce any mitigating factor that the defendant can produce. According to Rodriguez, Pass would have testified that Rodriguez lacked the capacity to appreciate the criminality of his conduct and that his mental disorder prevented him from knowing right from wrong. We conclude that this argument is totally without merit because, even though the court limited Pass's testimony, she stated before the jury that she "did not think that [Rodriguez] knew right from wrong or the nature of the consequences of his acts [in 1977]."
*46 In his seventh claim, Rodriguez claims that the trial court improperly considered as separate aggravating circumstances that the murder was committed during an armed burglary and was committed for pecuniary gain. We agree. We have previously determined that when two aggravating circumstances refer to the same aspect of a crime the two aggravators cannot be considered separately. We found in Cherry v. State, 544 So.2d 184, 187 (Fla.1989), that when someone commits a murder after breaking into a home with the intent to steal something, the aggravating factors that the murder was committed for pecuniary gain and committed during the course of a burglary should be considered as one aggravating circumstance. As in Cherry, the purpose of the burglary in this case was to rob the Josephs. Accordingly, we conclude that the trial judge erroneously considered these two aggravators separately. Nevertheless, given the five remaining valid aggravating circumstances, we find this error to be harmless beyond a reasonable doubt.
Next, Rodriguez argues that the trial court erred in finding the murders to be CCP. He contends instead that the murders were committed during the course of a heated argument and that the trial court improperly considered a prior inconsistent statement as substantive evidence in reaching its conclusion as to this aggravating circumstance. We disagree.
To establish CCP, the State must show that the murder was (1) the product of a careful plan or prearranged design; (2) the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage; (3) the result of heightened premeditation; and (4) committed with no pretense of moral or legal justification. Jackson v. State, 704 So.2d 500, 504 (Fla.1997). Here, the court found CCP based on the following facts: Manuel Rodriguez called Luis Rodriguez to elicit his assistance in the crime; Manuel planned a ruse to enter the apartment but formulated a back-up plan to force his way into the apartment if that plan failed; Manuel armed himself with a loaded handgun and two pairs of latex gloves so as not to leave any fingerprints in the apartment if the initial plan did not work; Manuel fired an additional shot into each victim from close range to make sure they were dead; none of the elderly victims offered any resistance; each victim was shot while seated and fully compliant; and Manuel told Malakoff that he made certain that the victims were dead.
Manuel Rodriguez argues that the victims were actually shot during a fit of rage. He also argues that Malakoff's statement that Manuel Rodriguez told her he made certain the victims were dead was not admissible as substantive evidence to support this factor because it was introduced as a prior inconsistent statement solely to impeach Malakoff. The record reflects that Luis Rodriguez testified that two arguments occurred. The first occurred when Luis found the gun in the bedroom; at that point, Manuel looked at Sam Joseph and started cursing at him. Luis stated that Manuel was "very, very upset at him." Subsequently, Manuel went into the bedroom but came back when Abraham knocked on the door. Manuel let Abraham in, and Abraham and the Josephs started speaking in a language that was not English or Spanish. This again made Manuel angry and another argument ensued. However, the argument ended "immediately" because Manuel raised the gun and shot both Sam and Bea Joseph. While it is true that Manuel shot the Josephs while they were arguing, the totality of the circumstances as outlined above establishes that Manuel planned to kill the victims prior to the argument, especially given that Manuel took guns and gloves with him to the apartment, knew the Josephs could identify him, ordered Luis to shoot Abraham after he shot the Josephs, and then fired additional shots from close range to ensure that the victims were dead.
*47 Regarding the admissibility of Malakoff's prior inconsistent statement to the police that Manuel Rodriguez stated that he "made sure they were dead," Rodriguez argues that Morton v. State, 689 So.2d 259 (Fla.1997), and Dudley v. State, 545 So.2d 857 (Fla.1989), preclude the use of that statement as substantive evidence in the penalty phase. Clearly, the prior inconsistent statement was admissible in the guilt phase only for purpose of impeachment and could not be used as substantive evidence against Rodriguez. See § 90.608, Fla. Stat. (1997). The question here is whether the statement could be used as substantive evidence in the penalty phase even though it was not permissible to use the statement as such in the guilt phase.
As noted previously, under section 921.141(1), hearsay evidence is admissible in the penalty phase so long as it is relevant and the defendant has the opportunity to rebut it. In Morton, the State introduced the prior inconsistent statements of a number of witnesses in the guilt phase for purposes of impeachment. We concluded that the "cumulative effect of continual impeachment made it ... difficult for the jury to separate substantive evidence from the evidence it had been instructed to consider solely for impeachment." 689 So.2d at 264. We also noted that the prosecutor compounded the problem by asserting in both the guilt and penalty phases the content of the impeaching statements as proven facts. Accordingly, although we found the error to be harmless in the guilt phase, we remanded the case for a new penalty phase proceeding. We made a similar finding in Dudley. However, in neither of those cases did we address the fact that hearsay evidence is admissible in the penalty phase as substantive evidence so long as it is relevant and the defendant has the opportunity to rebut it. See § 921.141(1), Fla. Stat. (1997). Under section 921.141, the appropriate test for determining whether hearsay evidence is admissible is whether the evidence is relevant and probative of the defendant's guilt. So long as the prejudicial nature of the hearsay does not outweigh its probative value and the defendant has an opportunity to rebut the hearsay, it is admissible. In this case, the prior inconsistent statement was properly used in the guilt phase for impeachment purposes only. Under section 921.141, it was admissible as substantive evidence in the penalty phase because it was relevant and probative to the aggravating circumstances of both CCP and that the murder was committed to avoid arrest. Rodriguez had an opportunity to rebut Malakoff's testimony regarding this statement and she testified regarding why her pretrial statements differed from her trial testimony. At this point, for purposes of the penalty phase, it was a question of which statements were more credible: her pretrial statements or her trial statements. Based on the record before us, we conclude that the trial court did not abuse its discretion in finding the pretrial statements to be more credible. Accordingly, we find that the trial court properly considered Malakoff's statement as substantive evidence in the penalty phase proceeding. We recede from both Morton and Dudley to the extent they hold that a prior inconsistent statement cannot be used as substantive evidence in a penalty phase proceeding. We note, however, that in Morton, we still would have remanded the case for a new penalty phase proceeding because the State introduced the prior inconsistent statements of numerous witnesses, and significant confusion was caused by the repeated impeachment and the prosecutor's closing argument. Under such circumstances, the prejudicial nature of the statements far outweighed their probative value.
In his final claim, Rodriguez contends that, for many of the same reasons he asserted against a finding of CCP, this murder was not committed to avoid arrest. To establish the avoid-arrest aggravator when the murder does not involve a law enforcement officer, the requisite intent to avoid arrest must be "very *48 strong," Riley v. State, 366 So.2d 19, 22 (Fla.1978); that is, the proof must demonstrate beyond a reasonable doubt that the victim was murdered solely or predominantly for the purpose of witness elimination. Urbin v. State, 714 So.2d 411 (Fla. 1998); Consalvo v. State, 697 So.2d 805 (Fla.1996), cert. denied, 523 U.S. 1109, 118 S.Ct. 1681, 140 L.Ed.2d 819 (1998). Additionally, a murder may be both CCP and committed to avoid arrest as long as distinct facts support each circumstance. Stein v. State, 632 So.2d 1361 (Fla.1994). The facts supporting CCP must focus on the manner in which the crime was executed, e.g., advance procurement of weapon, lack of provocation, killing carried out as a matter of course, whereas the facts supporting commission to avoid arrest must focus on the defendant's motivation for the crime. Id.
Here, the court found the avoid-arrest aggravator based on the following circumstances: Manuel Rodriguez knew the Josephs; he knew the Josephs were home when he entered their apartment; he armed himself beforehand with a gun and latex gloves; he told Luis Rodriguez to put on a pair of the gloves and not to touch anything; there was an outstanding warrant for Manuel's arrest and Manuel knew that if he was identified he would likely go to jail for a lengthy period; after he shot the Josephs, he ordered Luis to shoot Abraham; each of the victims was shot more than once and each was shot from close range in the head; Abraham was shot not only with the gun used by Luis, she was also shot in the head with the gun used by Manuel; and Manuel told Malakoff after the murders that he "made sure they were all dead." We find that this evidence is sufficient to support the finding that the murders were committed to avoid arrest.
Although Rodriguez has not specifically raised the proportionality of the death sentences on appeal, we find the sentences to be proportionate when compared to other cases in which we have affirmed the death sentence.
Accordingly, we affirm Manuel Antonio Rodriguez's convictions and sentences for armed burglary and three counts of first-degree murder, including the sentences of death for each of the first-degree murder convictions.
It is so ordered.
HARDING, C.J., and SHAW, ANSTEAD and PARIENTE, JJ., concur.
WELLS, J., concurs in result only with an opinion.
WELLS, J., concurring in result only.
I concur as to the conviction and sentence in result only.
I cannot concur in the very broad statements contained in that portion of the opinion which pertains to the prosecutor's comments.
I do not concur in the majority discussion of appellant's penalty issue claim number five. I do not know what the majority means when it states, "[w]e clarify that the mere fact that a defendant has an opportunity to cross-examine the witness who is testifying to the hearsay does not alone constitute a fair opportunity to rebut the hearsay statement." Majority op. at 32. It appears to me that the statement conflicts with this Court's decision in Lawrence v. State, 691 So.2d 1068, 1073 (Fla.1997).
In our prior cases, this Court has respected the plain meaning of the legislative evidentiary standards in capital penalty phase proceedings which allows
evidence ... as to any matter that the court deems relevant to the nature of the crime and character of the defendant.... Any such evidence which the court deems to have probative value may be received, regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements.
*49 § 921.141(1), Fla. Stat.; see Spencer v. State, 645 So.2d 377 (Fla.1994); Rhodes v. State, 638 So.2d 920, 924 (Fla.1994); Waterhouse v. State, 596 So.2d 1008, 1016 (Fla.1992). I see no reason to cast doubt on this procedure with dicta on this issue in this opinion.
NOTES
[1] In his initial confession, Luis Rodriguez stated that he shot Abraham through a pillow; that he shot at two people; that he had ingested cocaine and marijuana before the homicides; and that Manuel Rodriguez shot the Josephs after he shot Abraham.
[2] The trial judge found that Manuel Rodriguez planned the crimes and was the dominant participant in the crimes. Further, the judge noted that Luis Rodriguez had only one prior felony conviction, whereas Manuel had 71; that Manuel was on parole at the time of the murders but Luis was not; and that Manuel repeatedly lied to police, whereas Luis was cooperative and provided truthful information from the beginning. Accordingly, the trial judge found no disparity in sentencing Luis to life and Manuel to death.
[3] Rodriguez claims that: (1) his right to silence and his failure to testify were improperly commented on at trial; (2) the trial court erroneously refused to allow a peremptory challenge as to a Hispanic venireperson; (3) the trial judge erroneously allowed a State peremptory challenge; (4) the State was improperly permitted to present evidence of collateral criminal activity; (5) the State was improperly permitted to introduce hearsay evidence in the penalty phase proceeding; (6) the trial court improperly limited Rodriguez's introduction of evidence in mitigation; (7) the trial court improperly considered felony murder and pecuniary gain as aggravating circumstances; (8) the trial court erred in finding that the murder was CCP; and (9) the trial court erred in finding that the murder was committed to avoid arrest.
[4] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[5] This is different from the situation at issue in Franqui v. State, 699 So.2d 1332 (Fla. 1997), where we indicated that there was no need to state on the record the race of the challenged venireperson. In Franqui, we found that the trial court clearly knew the venireperson was Hispanic because he was born and raised in Havana, Cuba, and his name was Aurelio Diaz. Here, the allegation that the similarly situated venireperson was Hispanic is based on the venireperson's name, and it is this Court and not the trial court that is being asked to evaluate whether the similarly situated venireperson was Hispanic.
[6] We also note that if the State had called Lago to testify and Lago had denied that Manuel Rodriguez made these incriminatory statements, the State could have then impeached Lago by Detective Crawford's testimony to the contrary.