# Third District Court of Appeal
## State of Florida

Opinion filed June 11, 2025.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D24-0174
Lower Tribunal No. F21-19386
_____

**Atoya Holmes,**
Appellant,

vs.

**The State of Florida,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, William Altfield, Judge.

Rier Jordan, P.A., and Jonathan E. Jordan, for appellant.

James Uthmeier, Attorney General, and Katryna Santa Cruz, Assistant Attorney General, for appellee.

Before FERNANDEZ, MILLER and GOODEN, JJ.

GOODEN, J.

This case stems from a deadly shooting on November 7, 2021. Appellant Atoya Holmes appeals her conviction and sentence. Holmes raises multiple issues. We write to address one issue concerning opening the door to prior bad act evidence. Because we find harmful error occurred, we reverse and remand for a new trial.

**I.**

Atoya Holmes and Verdell Goins met when they were sixteen and twenty years old. They dated for several years. After they broke up, each went on to marry other people. Almost twenty years later, the couple reconnected. They rekindled their romance and began having an affair. Tragically, the relationship was marred with domestic violence.

On November 7, 2021, Holmes and Goins went to a tailgate party at a Miami Dolphins game. Both were drinking. After the game ended, Holmes wanted to go to a bar. When Goins declined, Holmes angrily said it was because his other girlfriend would be there. Holmes and Goins left together, with Goins driving Holmes' vehicle.

The couple then went to a friend's home. While still in the car, Goins told the friend that Holmes was "just tripping because I know she'll never leave her husband for me. I've been divorced. She's been dragging me for

2

six or seven years. And I got a woman, anyway." In response, Holmes hit Goins two or three times. The couple drove off.

Eventually, Goins pulled over and stopped the vehicle. Goins reached over the console, grabbing Holmes' hand. Twisting it, he pulled off several fingernails. Holmes shifted her body to alleviate the pain. She tried to exit the vehicle, but Goins pulled her back by her hair. To no avail, Holmes tried to kick and push him away. Goins put his hands around Holmes' neck and choked her to the point that she passed out.

When Holmes came to, Goins attacked her again. Holmes then grabbed a gun from the passenger door and shot Goins twice in his right shoulder. Holmes claimed that his body fell onto her and was unresponsive. She slid from underneath his limp body that was still secured by his seatbelt. She then exited the vehicle, placed the gun on top of the car, and asked a passerby to call 911. She did not attempt to hide the gun.

When police arrived, Holmes stood near a light pole. Holmes' lip was swollen and there was dried blood around her mouth. She was missing fingernails and had abrasions and bruises on her body. She also smelled of alcohol. But Holmes did not have any of Goins' blood on her. Holmes told the police that she shot Goins in self-defense as he was beating her.

3

The State charged Holmes with second-degree murder. Holmes claimed self-defense. The case proceeded to trial.

In her case in chief, Holmes testified. During direct examination, the following exchange occurred:

Q:  Now as you called 911 and you were leaning on that pole, what were you feeling in that moment?

A:  I can't even explain it. I have never experienced anything like that before to have killed somebody or hurt somebody that you love and know that it is at your hands. I can't even explain it.

Before cross-exanimation, the State asserted that this testimony was misleading, and opened the door for the State to introduce that Holmes shot her son in 2017. Holmes was not arrested or charged for the incident. The State noted that, while introducing herself to the jury, Holmes discussed her children in a positive light. Among other arguments, Holmes responded that the sentence was taken out of context and violative of section 90.403, Florida Statutes.

Over objection, the trial court allowed the State to extensively question Holmes about the 2017 shooting. The questioning went into details such as how many shots were fired, what part of her son's body was shot, where the shooting occurred, why she shot her son, and whether she claimed self-defense. The State then—as the very next question—explicitly tied that

4

event to the current case.  Throughout the exchange, the State framed Holmes as a liar.

During closing, the State pointed to the 2017 shooting and emphasized that Holmes was not truthful:

> Number two.  She intentionally misled you.
>
> She sat here, and at the same time looked you straight in the eye and told you that she had never experienced something like this before.  Where she killed, or hurt, someone she loved.
>
> But it turns out that that's not true either.  Because she shot her own son in 2017.  Flesh and blood.  Shot her son.
>
> Now you're not here to judge the circumstances of what happened back then.  It was a family affair.  But what is important is that she was, and has, used deadly force against a loved one, and knew exactly what it was like to be in that situation.  But she wanted you to believe something else.  To believe something that wasn't true.

The jury found Holmes guilty of the lesser-included manslaughter.  She was sentenced to thirteen years.  This appeal followed.

## II.

"We review a trial court's decision to admit evidence under an abuse of discretion standard.  That discretion, however, is limited by the rules of evidence."  Hudson v. State, 992 So. 2d 96, 107 (Fla. 2008) (citations omitted).

## III.

5

Evidence of collateral crimes, wrongs, or bad acts is inadmissible when it is solely to prove bad character or propensity. § 90.404(2), Fla. Stat. (2023). At the same time, a criminal defendant may open the door to such evidence. "As an evidentiary principle, the concept of opening the door allows the admission of otherwise inadmissible testimony to qualify, explain, or limit testimony or evidence previously admitted. The concept of opening the door is based on considerations of fairness and the truth-seeking function of a trial." Rodriguez v. State, 753 So. 2d 29, 42 (Fla. 2000) (quotations and citations omitted).

"To open the door to evidence of prior bad acts, the defense must first offer misleading testimony or make a specific factual assertion which the state has the right to correct so that the jury will not be misled." Bozeman v. State, 698 So. 2d 629, 630 (Fla. 4th DCA 1997). See also Robertson v. State, 829 So. 2d 901, 911 (Fla. 2002) ("Thus, even if the prior crime evidence is not relevant under section 90.404(2)(a), a testifying defendant may nonetheless open the door to the prior crime evidence by (1) offering a trait of the defendant's good character, see § 90.404(1)(a) (character of accused), or (2) inaccurately testifying to material facts, see § 90.404(1)(c) (character of witness), § 90.608(5) (contradiction on relevant facts).").

Yet the State is not entitled to offer such evidence merely because

6

testimony was misleading. "Rather, the State must demonstrate a legitimate need to resort to such evidence to correct a false impression." Redd v. State, 49 So. 3d 329, 333 (Fla. 1st DCA 2010). "A suggestion or insinuation made in the defense case cannot be used as a pretext to inform the jury that he [or she] has been convicted of a crime before. Many false impressions could be cleared up with far less." Hill v. State, 933 So. 2d 667, 670 (Fla. 1st DCA 2006).

Once it is determined that the door has been opened, the inquiry has not ended. Indeed, "[t]he issue is not always whether the door has been opened, but rather how wide it has been opened." Rodriguez, 753 So. 2d at 42. The questioning should be narrowly tailored to just fit through that door. See Calloway v. State, 210 So. 3d 1160, 1186 (Fla. 2017) ("However, the court narrowly tailored the admission of evidence of prior criminal conduct to Calloway's familiarity with guns, which was a matter that he himself introduced, and excluded further evidence of his arrest record, which included more than a dozen arrests in the six years prior to the arrest in this case . . . . The trial court did not abuse its discretion when it permitted this narrow inquiry into his prior criminal activities."). "Otherwise, the 'opening the door' rule threatens to become a pretext for the illegitimate use of inadmissible evidence, and the fairness-promoting purpose of the rule is

lost." Redd, 49 So. 3d at 333. The probative value of such evidence would be substantially outweighed by the danger of unfair prejudice. § 90.403, Fla. Stat. (2023).

While the trial court was correct in its assessment that the door was opened, the State's cross-examination of Holmes went well beyond simply clarifying whether Holmes had harmed someone she loved before. See Pacheco v. State, 698 So. 2d 593, 595 (Fla. 2d DCA 1997). The State explored the specific details of the 2017 incident—how many shots, where she was located, where on his body he was shot, why she shot her son, and whether she claimed self-defense. The extensive details of the 2017 incident were not legitimately necessary to qualify or explain Holmes' testimony. What is more, the State expressly linked Holmes shooting her son to her shooting Goins. See § 90.403, Fla. Stat. The State went too far and flung the door wide-open. Melendez v. State, 135 So. 3d 456, 460 (Fla. 5th DCA 2014). See generally Randolph v. State, 463 So. 2d 186, 189 (Fla. 1984) ("[T]he prosecution should not go too far in introducing evidence of other crimes. The state should not be allowed to go so far as to make the collateral crime a feature instead of an incident."). This was an abuse of discretion.

Given the highly inflammatory nature of the details of the prior

8

shooting, the State cannot establish beyond a reasonable doubt that this admission constituted harmless error. See generally Czubak v. State, 570 So. 2d 925, 928 (Fla. 1990) ("Erroneous admission of collateral crimes evidence is presumptively harmful."); Straight v. State, 397 So. 2d 903, 908 (Fla. 1981) (explaining admission is "presumed harmful error because of the danger that a jury will take the bad character or propensity to crime thus demonstrated as evidence of guilt of the crime charged."). Therefore, we reverse and remand for a new trial.

"Evidence that suggests a defendant has committed other crimes or bad acts can have a powerful effect on the results at trial." Bozeman, 698 So. 2d at 631. "[W]e caution trial courts to exercise extreme caution in admitting evidence of prior collateral crimes, even when faced with an argument by the State that the door has been opened." Rodriguez, 753 So. 2d at 42. See also Calloway, 210 So. 3d at 1186 ("However, such evidence should be cautiously admitted, due to concerns that it may unfairly prejudice the defendant."). Such questioning should be narrowly tailored to simply address the misleading testimony.

Reversed and remanded.

9